United States District Court
District of Connecticut
FILED AT NEW HAVEN
7/2 2004

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CADLEROCK PROPERTIES JOINT VENTURE, L.P. :

    Plaintiff                                   :         CIVIL ACTION NO.
                                          :         301:CV896 (MRK)
vs.                                         :

BENJAMIN SCHILBERG; SCHILBERG INTEGRATED :
METALS CORP.; THOMAS NIGRO; ASHFORD :
DEVELOPMENT CO.; DENNIS V. LOVELY; :
ANTHONY M. MILO; JAMES A. STEVENS; WILSON :
MORIN; JEAN G. MARTIN; DAVID W. FLORIAN; :
THOMAS STANTON, JR.; CHRISTIAN R. :
BRAYFIELD; CHARLES HILLS; and SUBURBAN :
EXCAVATORS, INC. :
                                          :
    Defendants                         :        JULY 2, 2004

## ANTHONY M. MILO'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure and Rule 56(a) of the Local Rules of Civil Procedure, Defendant Anthony M. Milo ("Defendant Milo")submits this Memorandum of Law in support of his Motion for Summary Judgment as to the three counts raised by the Plaintiff in its Amended Complaint dated November 30, 2001. A "Local Rule 56(a)(1) Statement" accompanies this Memorandum of Law.

### SUMMARY OF ARGUMENT

This brief sets forth three arguments upon which this Court should, as a matter of law, grant Defendant Milo's Motion for Summary Judgment. In Part B, we advise the Court of a case pending before the U. S. Supreme Court which would be dispositive of this case as the Plaintiff's claims would not be subject to the jurisdiction of the federal courts. In *Cooper Industries, Inc. v.*

*Aviall Services, Inc.*, 2002 U.S. Briefs 1192 (Before the United States Supreme Court on Writ of Certiorari, No. 02-1192, 2004), the issue is whether an action for contribution under CERCLA §113(f)(1) can be brought in federal court in the absence of an underlying §106 or §107(a) government enforcement action. The undisputed facts demonstrate that the Plaintiff has not been sued by the government under CERCLA and, since there is no independent claims of federal jurisdiction, the action must be dismissed.

Part C presents four arguments which bar the Plaintiff from seeking any further recovery for environmental damage by reason of its settlement of environmental claims during the foreclosure proceedings. Two arguments maintain that the Plaintiff is barred from reasserting its environmental claims as such claims were already resolved in the state court foreclosure proceeding, first, because the entry of a deficiency judgment settled the broad environmental obligations contained in the mortgage instruments and second, because the deficiency judgment award established the value of environmental damage to the property in arriving at the fair market value of the property. The undisputed facts establish the existence of mortgage instruments containing environmental provisions and the entry of a state court deficiency judgment.

The third argument based on the mortgage instruments is that the Plaintiff has settled its environmental claims by receiving payment of the deficiency award. The undisputed facts demonstrate that the Plaintiff received $217,500 in full settlement of the deficiency award and provided a satisfaction of judgment acknowledging settlement.

The final argument arising from the mortgage instruments is that the Plaintiff is collaterally estopped from filing this action or obtaining a recovery after receiving compensation

for environmental damages by payment of the deficiency judgment. No additional facts must be proven for this argument.

Finally, in Part D, we assert that the Plaintiff cannot meet the burden imposed by *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) to prove that a corporation shareholder, director, officer or employee is liable under CERCLA. *Bestfoods* requires the Plaintiff to demonstrate such person managed, directed or conducted operation of the corporation specifically related to pollution, i.e., operations having to do with leakage or disposal of hazardous waste, or decisions about compliance with environmental laws. The undisputed facts will demonstrate that Defendant Milo was a 10% minority shareholder who did not participate in and did not observe any operations involving the demolition of structures or the burning or burial of the debris alleged to be the basis of CERCLA liability by the Plaintiff.

I.  BACKGROUND

On August 23, 1988, the Ashford Development Company ("Defendant Ashford") acquired approximately 335 acres in the Towns of Ashford and Willington intending to develop such property for commercial and residential use. (Exhibit A). Simultaneously, it entered into a mortgage in the principal amount of $3,000,000 with State Savings Bank. (Exhibit C). This mortgage was further secured by limited personal guarantees from each of the shareholders, including Defendant Milo. (Exhibit D). The Ashford mortgage was acquired by Shawmut Bank Connecticut, National Association which contracted for environmental studies on the property in advance of foreclosure proceedings. However, prior to foreclosure The Cadle Company of Connecticut, Inc. acquired the note and mortgage from Shawmut by an Assignment dated February 18, 1994. (Exhibit F). The Loan Purchase Agreement acknowledged receipt of environmental reports on the property (Exhibit E). Thereafter, it commenced a foreclosure

action naming Ashford Development and substantially all the investors including Defendant Milo. (Exhibit I).

In 1995, Defendant Ashford settled the foreclosure action by conveying a Quit Claim deed to Cadle Properties of Connecticut, Inc. (Exhibit G). However, after surrender of the property, a deficiency action was pursued against the investors/shareholders who personally guaranteed the mortgage notes (Exhibit J). The parties agreed to a stipulated fair market value for the Ashford property of $795,000 and, thereafter, a deficiency judgment was entered on or about August 15, 1997. (Exhibit J). Defendant Milo's guaranty was limited to $300,000 and he and several other shareholders negotiated a payment of $217,500 each, for what Defendant Milo considered to be a full settlement of all his obligations for the property. (Exhibit K). Defendant Milo provided a release to Cadle and expected to receive a mutual release in return. (Exhibit L). Instead, he received a Satisfaction of Judgment dated May 28, 1998.[1] (Exhibit M).

On April 17, 1995, representatives of Cadle Properties met with the Department of Environmental Protection to discuss the environmental condition and development of the Ashford Property. (Exhibit O). Thereafter, Cadle Properties transferred the real estate to Cadlerock Properties Joint Venture, L.P., the Plaintiff[2] on November 15, 1996. In August of the following year, the Department of Environmental Protection ("DEP") issued an Order to the Plaintiff alleging non-compliance with the State's solid waste laws. (Exhibit P).

On May 4, 1999, the Plaintiff commenced its third action against Defendant Ashford and the shareholders, including Defendant Milo and other defendants, for alleged contamination of the Ashford Property (Exhibit N). Two years later, the Plaintiff commenced its fourth action,

---

[1] Presumably, the $217,500 corresponded to 10% the amount of principal on the outstanding loan.
[2] Hereafter, the term Plaintiff shall include The Cadle Company of Connecticut, Inc., Cadle Properties of Connecticut, Inc. and Cadlerock Properties Joint Venture, L.P. All three companies are controlled directly or indirectly by Daniel Cadle. (Exhibit U).

4

17086.001/363375.1

the present action, against Defendant Ashford and the shareholders, including Defendant Milo and other defendants under CERCLA in federal court. Thus, in ten years, the Plaintiff and its related companies have commenced four actions/proceedings against Defendant Ashford and its shareholders, including Defendant Milo.

This background details facts necessary for a comprehensive understanding of the relationship between the parties. However, the arguments provided below rely upon a far narrower set of material facts, which are discussed in relation to the arguments to which they pertain.

III.  ARGUMENT

A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When ruling on summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party, and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S., at 255; see also, *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.), cert. denied, 506 U.S. 965 (1992). The Federal Rules, however, do not allow for the substitution of conclusory statements "for factual allegations." *Furlong v. Long Island College Hosp.*, 710 F.2d 922, 927 (2d Cir. 1983).

In opposing a motion for summary judgment, it is not enough for the non-moving party to "simply show that there is some metaphysical doubt as to the material facts" of the case. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-

17086.001/363375.1

5

movant must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 256-57. "The nonmovant must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Kunin v. Feofanov*, 69 F.3d 59, 61 (5th Cir. 1995) (internal citation omitted).

B. PLAINTIFF LACKS STANDING TO BRING THIS SECTION 113(f)(1) CONTRIBUTION ACTION, IF THE SOLICITOR GENERAL'S ARGUMENTS IN *COOPER INDUSTRIES V. AVIALL SERVICES, INC.* ARE ADOPTED BY THE U.S. SUPREME COURT

Pending before the United States Supreme Court is the case of *Cooper Industries, Inc. v. Aviall Services, Inc.*, No. 02-1192 (U.S. Supreme Court, filed Feb. 13, 2003) (Before the United States Supreme Court on Writ of Certiorari, No. 02-1192, 2004), which would be dispositive of this action. The issue in *Aviall* is whether a party that is potentially liable under CERCLA for cleanup of hazardous substances may seek contribution under Section 113(f)(1) from other potentially liable parties, if it has not been sued under Sections 106 or 107(a) of CERCLA to undertake or to pay for the cost of cleanup. At the invitation of the Supreme Court, the Solicitor General filed an amicus curiae brief on behalf of the United States Environmental Protection Agency ("EPA") in the *Aviall* case. The Solicitor General supports the contention that a Section 113(f)(1) action must be premised on a prior or concurrent suit under CERCLA Section 106 or 107(a). Defendant Milo adopts the argument of the Solicitor General contained in his Brief, a copy of which is attached.

Aviall Services, Inc. ("Aviall") sued Cooper Industries, Industries. ("Cooper Industries") to recover expenses it incurred in cleaning up property that Aviall purchased from Cooper Industries. Aviall notified the Texas Natural Resource Conservation Commission ("TNRCC") of the contamination. The TNRCC directed the company to take corrective action and, thereafter,

6

17086.001/363375.1

threatened to take enforcement action if the company failed to pursue one of two suggested remediation options. 312 F.3d 677 (5th Cir. 2002) However, neither the United States nor Texas sued Aviall to compel cleanup or to recover response costs under CERCLA. The CERCLA §113(f)(1) contribution claim was the sole basis for federal jurisdiction.

The Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. 9601 et seq. was enacted in 1980. The 1980 Act gave EPA several enforcement weapons. It could (1) clean up a contaminated site and then sue to recover its response costs from responsible parties, §107(a) as codified at 42 U.S.C. §9607, (2) compel a responsible party to remediate a site under an administrative order, §106, as codified at 42 U.S.C. §9606, or (3) negotiate a settlement, §122, as codified as 42 U.S.C. §9622. CERCLA was silent on the apportionment of liability, and as the courts began to interpret CERCLA to impose joint and several liability on the responsible parties, in order to facilitate case management the EPA elected to target a small number of potentially responsible parties in its enforcement actions. (*United States v. Chem-Dyne Corp.*, 572 F.Supp. 802 (1983) wherein the government sued 20 of 289 potentially responsible parties). Concurrently, the courts were divided on the question of whether there was an implied right of contribution under CERCLA. *United Technologies Corporation v. Browning-Ferris Industries*, 33 F.3d 96, 100 (1994).

CERCLA was amended by the enactment of the Superfund Amendments and Reauthorization Act of 1986 ("SARA") to provide for a right of contribution "during or following any civil action under section 9606…or section 9607(a)…" (§113(f)(1) as codified at 42 U.S.C. §9613) or after resolving "…its liability to the United States or a State … in an administrative or judicially approved settlement…." (§113(f)(3)(B)) This change was intended to provide an express right of contribution where there was an underlying §106 or §107(a)

17086.001/363375.1

action by the government or an administrative or judicially approved government settlement. There was no such intent to create a right of contribution in a private party action where there was no CERCLA governmental action, because §113(f) was intended to ameliorate the imposition of joint and several liability in a government enforcement action.

Section 113(f) affords relief to those parties subject to joint and several liability in a government CERCLA action by allowing contribution against other potentially responsible parties. The salient portions of Section 113(f)(1) provide:

> "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title." (emphasis added)

The Solicitor General argues that Section 113(f)(1) contains limitation on the scope of contribution and does not authorize any action in the absence of an ongoing or completed Section 106 or 107(a) civil action. The savings clause appearing in the last sentence of the section does not create an independent cause of action. It merely preserves any independent right a potentially responsible party may have, apart from Section 113(f)(1), to seek contribution. It does not itself give rise to a right of contribution in a private party litigation, absent an underlying government CERCLA action. This interpretation is consistent with the plain language of the Statute and the goal of SARA to provide potentially responsible parties sued by State or federal government under CERCLA with a claim in contribution.

A favorable ruling by the Supreme Court adopting the arguments of the Solicitor General will be dispositive of this case. Plaintiff's assertion of federal jurisdiction is premised on its

§113(f)(1) contribution claim. It has no other independent basis for federal jurisdiction. (See Amended Complaint) While the Connecticut Department of Environmental Protection ("DEP") has issued an order against Plaintiff Cadlerock dated August 15, 1997 (Exhibit P), such order was premised on State Solid Waste Laws.[3] The order asserts only State claims and provides, "Pursuant to Sections 22a-6, 22a-225, 22a-424, and 22a-432 of the Connecticut General Statutes, the Commissioner orders the Respondent as follows:" (See Paragraph B of the Order) Neither the State DEP nor federal EPA commenced an action against Plaintiff Cadlerock under CERCLA. (See Armstrong Affidavit, Exhibit X). Thus, the facts of *Aviall* and the instant matter are parallel and a decision by the U.S. Supreme Court recognizing that Section 113(f)(1) limits claims to actions where there is an underlying State or federal CERCLA claim would be dispositive of the Cadlerock federal litigation.

C. **MILO'S SATISFACTION OF THE DEFICIENCY JUDGMENT IN THE FORECLOSURE PROCEEDINGS OPERATES TO BAR THE PLAINTIFF'S CURRENT ACTION.**

Plaintiff cannot now seek additional compensation from Defendant Milo for damage to the Ashford real property existing prior to the settlement of that action under any legal theory, because of the relationship between these parties, Plaintiff, as mortgagee and Defendant Milo, as guarantor, of the mortgagor. The settlement of the deficiency action serves to bar any additional claims that Plaintiff would now assert against Defendant Milo. Connecticut law provides that a deficiency action is the final act, by which a mortgagee may be made whole, and which precludes any other remedy.

---

[3] Paragraph A.7. of the Order states, "By virtue of the above, Respondent (Cadlerock Properties Joint Venture, L.P.) is maintaining a solid waste disposal facility without a permit pursuant to Section (sic) 22a-208a(b) of the Connecticut General Statutes."

## 1. AS A MATTER OF LAW, THE ENTRY OF THE DEFICIENCY JUDGMENT OPERATED TO DEFINE DEFENDANT MILO'S ENVIRONMENTAL OBLIGATIONS.

When the deficiency judgment was entered against Defendant Milo in the foreclosure proceedings, it operated to define the limits of Defendant Milo's personal obligations under the mortgage instrument including the instrument's environmental obligations.

The following facts are undisputed:

(1) Ashford mortgaged the Ashford real property to State Savings Bank. Mortgage, attached as Exhibit C.

(2) Defendant Milo personally guaranteed the loan securing that mortgage, to a maximum personal limit of $300,000. Guaranty, attached as Exhibit D.

(3) Plaintiff instituted a foreclosure action in Connecticut Superior Court, based upon the mortgage. Corrected Memorandum of Decision (Exhibit J)

(4) The Superior Court entered a deficiency judgment for Plaintiff and against Defendant Milo related to the Corrected Memorandum (Exhibit J).

In *Union Trust Company v. Precast Inc.*, 1995 Conn. Super. LEXIS 1294 (No. CV-94-0064387, Conn. Super. 1995), the Superior Court of Connecticut reviewed the claims of a mortgagee plaintiff, who was seeking recovery from the guarantor of the mortgagor for, among other things, environmental damage to the mortgaged real property. *Union Trust*, at 1-2, 12. In this case the mortgage included provisions requiring the mortgagor to keep the real property free from environmental contamination, and permitted the mortgagee to add any amounts spent by the mortgagee with respect to any contamination to the mortgage debt. *Id.*, at 12-14.

The Superior Court held that because the damages arose from agreements contained in the mortgage, they constituted amounts due under the mortgage, or part of the mortgage debt.

10

17086.001/363375.1

*Union Trust*, at 13-14. That court further held that the mortgagee plaintiff was precluded from seeking damages arising under the mortgage agreement outside of the remedies provided by foreclosure and deficiency judgment. *Id.* at 14-15. In so holding, the Superior Court relied upon Connecticut statutory provisions, which preclude recovery by any means other than actions in foreclosure and deficiency judgment.

Specifically, the Superior Court cited Connecticut General Statutes §§ 49-1 and 49-28 as precluding additional recovery. *Union Trust*, at 14. Connecticut General Statutes § 49-1 provides, in relevant part:

> The foreclosure of a mortgage is a bar to any further action upon the mortgage debt, note or obligation against the person or persons who are liable for the payment thereof who are made parties to the foreclosure[.]

Additionally, Connecticut General Statutes § 49-28 provides, in relevant part, that "all other proceedings for the collection of the debt shall be stayed during the pendency of the foreclosure suit, and, if a deficiency judgment is finally rendered therein, the other proceedings shall forthwith abate." Conn. Gen. Stat. § 49-28. Connecticut courts have interpreted these provisions to preclude any other form of recovery on mortgage obligations and mortgage debt. Specifically, the Supreme Court of Connecticut has held that "[A] deficiency judgment, in light of § 49-1, is, therefore, the only available means of satisfying the mortgage debt when the security is inadequate to make the foreclosing plaintiff whole." *Eichman*, 216 Conn. at 449; *People's Bank v. Bilmor Building Corp.*, 28 Conn. App. 809, 822 (1992).

Citing the aforementioned statutes and Connecticut case law, the court in Union Trust held that the plaintiff mortgagee could not seek environmental damages against the guarantor of the mortgage, because a deficiency judgment represents the final resolution to obligations

17086.001/363375.1

11

contained in a mortgage agreement. Union Trust, at 15. This reasoning is applicable to the case at bar, and precludes Plaintiff from recovery under CERCLA.

As in Union Trust, the borrower in the present case promised within the Mortgage to refrain from damage to the real property, which would include environmental damage to the Ashford real property. Paragraph 6 of the Mortgage states, in relevant part, "Borrower shall not destroy, damage, or substantially change the Property, allow the Property to deteriorate or commit waste." (emphasis added) (Attached as Exhibit C). This clause dovetails with another found in the Mortgage, which gives the lender the right to remediate damage and add the costs to the amount owed by the borrower. Specifically, paragraph 7 of the Mortgage states, in relevant part:

> If Borrower fails to perform the covenants and agreements contained in this Security Instrument [. . .], then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. [. . .] Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument.

(attached as Exhibit C). Taken together, these paragraphs permit the Plaintiff to remediate any damage to property, and to add the costs to Defendant Ashford's debt. Because environmental harms fall squarely within the meaning of damage to property, Plaintiff had the opportunity to resolve any environmental issues as part of the foreclosure action, and deficiency judgment action in Connecticut's Superior Court.

This Court should interpret the Mortgage to include all of the environmental damage and costs sought in the present action. This interpretation represents the plain meaning of the document, as other courts have held in examining analogous claims.

In *BRE, Inc. v. Superior Block & Supply Co.*, 1997 Conn. Super. LEXIS 2783 (Superior Court of New Haven, No. CV 95380707, 1997) the Connecticut Superior Court held that the

17086.001/363375.1

12

plaintiff mortgagee had made a justiciable claim of waste where it alleged that the defendant mortgagor had spilled a substantial amount of oil on the real property. *BRE*, at *7-*12. In so deciding, the court adopted the following reasoning:

> [e]ven if the mortgagee is not in possession, if the waste or damage to the mortgaged property threatens to impair the mortgagee's security, and the mortgagor has failed or refused either to pursue the claim or to take other steps to avoid prejudicing the mortgagee's interest, the mortgagee has the right to protect his interest by pursuing the claim.

*BRE*, at *11 quoting *McCorristin v. Salmon Signs*, 244 N.J. Super. 503, 582 A.2d 1271, 1273 (1990). Like the oil spill in *BRE*, the contamination of the Ashford real property alleged by Plaintiff in the present matter would amount to waste. Accordingly, the provision in Mortgage paragraph 6 prohibiting the commission of "waste" would encompass the environmental harms alleged by Plaintiff. Any damage therefrom or remediation costs required could have properly been added to the debt owed under the Note, pursuant to paragraph 7 of the Mortgage, as described above.

Similarly, in *Stychno v. Ohio Edison Company*, 806 F.Supp. 663 (N.D. OH 1992), the United States District Court for the Northern District of Ohio interpreted a contract provision, which employed the phrase "property damage," concluded it would encompass deterioration of real property due to contamination by hazardous substances. See *Stychno*, at 670-76. The court reached the conclusion that "property damage" would embrace both the damages resulting from the devaluation of the property, and the costs of environmental remediation sought under a CERCLA action. *Stychno*, at 675-76. In holding that "property damage" includes environmental response costs, the court acknowledged that "[l]iability for environmental response costs is similar to compensation placing an individual in the position that he would have been in had the injurious action not occurred. This is how 'damages' is normally understood." *Id.*, at 675.

The United States District Court for the Northern District of Illinois has also considered the use of the phrase "property damage" in a contract relating to real property as encompassing environmental harms. *In American National Bank and Trust Company of Chicago v. Harcros Chemicals, Inc.*, 1997 U.S. Dist. LEXIS 7350 (No. 95 C 3750, ND IL 1997), that court, in considering liability under CERCLA, assessed the effect of a contract provision, in defining liability for "property damage." See American National, at *52-*64. In determining whether the language encompassed environmental harms, and without trying to manipulate the plain language of the contract, the district court pronounced that "contamination of soil by hazardous substances is a physical injury and thus constitutes property damage." *Id.*, at *62 (emphasis added).

Another contract provision allocating liability for "damage to property suffered upon the demised premises" was evaluated in *Keystone Chemical Co. v. Mayer Pollock Steel Corp.*, 1997 U.S. Dist LEXIS 10069 (No. 92-6000, ED PA 1997). In that case the United States District Court for the Eastern District of Pennsylvania, in considering a summary judgment motion in a CERCLA action, reviewed two lease provisions containing the phrase "damage to property." Keystone Chemical Co., at *11-*12. The first provision dealt with indemnity for damage to the property suffered upon the leased premises, and the second covered damage to property suffered off of the leased premises as a result of an act or omission of the lessee. *Id.* In holding that "damage to property" included environmental harms, the District Court stated that this interpretation was the "more sensible and reasonable reading of the contract language itself." *Id.*, at *16-*17.

As these cases demonstrate, when reviewing language relating to "damage to property" in real property contracts, courts have consistently interpreted such language to include CERCLA

14

damages. See, e.g., Stychno, 806 F.Supp. at 675-76; American National, 1997 U.S. Dist. LEXIS 7350 at *62; Keystone Chemical Co., 1997 U.S. Dist LEXIS 10069 at *16-*17. These decisions support the conclusion that in the present case, the language of paragraph 6 of the Mortgage, which includes the prohibition that the borrower shall not "damage [. . .] the Property," should be read to include environmental harms.

In fact, the language of the Mortgage on the Ashford real property is even broader than merely encompassing damage to property, as paragraph 6 also precludes deterioration, destruction, substantial change, and the commission of waste. Mortgage, at P. 6 (Attached as Exhibit C). The fact that the concept of property damage in and of itself has been held to encompass environmental damage in cases where the language did not contain such additional clauses secures the conclusion that, when taken in its entirety, paragraph 6 of the Mortgage includes a prohibition on environmental harms. Moreover, because paragraph 7 of the Mortgage permits the Lender to perform and pay for whatever is necessary to protect the value of the property, the Mortgage must also be seen to squarely encompass environmental remediation, in that the Lender could choose to pay for remediation and pass the expense on to the Borrower under the agreement. See Mortgage, at P. 7 (Attached as Exhibit C). Accordingly, environmental harms and the costs of remediation were recoverable as debt in the action on the Mortgage before the Connecticut Superior Court.

As in Union Trust any environmental harms and remediation costs in relation to the Ashford real property would have arisen as the breach of Mortgage obligations, and represented additional debt. Therefore, recovery for these obligations and debt is specifically limited by Conn. Gen. Stat. §§ 49-1, 49-28 to resolution by foreclosure and deficiency judgment.

> 2. AS A MATTER OF LAW, NOTWITHSTANDING THE LANGUAGE OF THE MORTGAGE, THE ESTABLISHMENT OF THE

17086.001/363375.1