ASHFORD REAL PROPERTY'S FAIR MARKET VALUE DURING THE DEFICIENCY ACTION INCORPORATED ANY ENVIRONMENTAL HARM TO THE PROPERTY; ACCORDINGLY, THE DEFICIENCY JUDGMENT BARS ANY FURTHER RELIEF FOR ENVIRONMENTAL HARM TO THE PROPERTY.[4]

Plaintiff submitted a stipulated valuation of the Ashford real property of $795,000.00 (Seven Hundred Ninety-Five Thousand Dollars) to the Superior Court to supplement its Motion for Deficiency Judgment. See Corrected Memorandum of Decision, *The Cadle Company of Connecticut, Inc. v. Ashford Development Co.*, No. CV-94-56277S (August 15, 1997) (Attached as Exhibit J). Subsequently, the Superior Court rendered a deficiency judgment for the Plaintiff based upon the valuation. *Id.* Shortly thereafter, Defendant Milo satisfied his personal liability to that judgment. (Satisfaction of Judgment, attached as Exhibit M). Since the Plaintiff was required by law to provide an accurate appraisal of the value of the Ashford real property, such appraisal would have taken into account any deterioration of the property due to environmental harm. Fair market valuation is the appropriate measure of establishing the value of real property in a deficiency action. See generally *Eichman*, 216 Conn., at 447 (discussing the evaluation of fair market appraisals in a deficiency action).

Therefore, in *Northeast Connecticut Economic Alliance, Inc. v. ATC Partnership*, 256 Conn. 813 (2001), The Connecticut Supreme Court held that in determining fair market value of real estate, environmental contamination and the costs of environmental remediation are relevant. *Id.*, at 833. The Court reasoned that excluding information regarding environmental contamination and/or remediation costs could lead to a fictional fair market value. *Id.*, at 834-38. Therefore, consideration of environmental damage and the costs of remediation are necessarily encompassed within the concept of fair market value.

---

[4] It is not necessary to assert any additional disputed facts.

16

17086.001/363375.1

This understanding of fair market value is wholly consistent with the traditional interpretation of that term. As this Court stated in *Jenkins v. Smith*, 21 F.Supp 251 (D.Conn. 1937):

> In determining the fair market value of any kind of property, the first thing to do is to define the object of the inquiry. The term "fair market value" comes from the realm of business and economics, and from the viewpoint of the court is a fact, an existing condition, which must be ascertained, but not created or altered by any rule of law. Primarily, it means the price at which a specified quantity of a given economic good is actually sold. It is an accomplished fact. More frequently, however, it means general or future power in exchange. But when we speak of fair market value as of a given past date, the term means the price that probably would have resulted had the [**5] good been exchanged between a willing, informed, and normal buyer and a similar seller.

*Id.*, at 253. Accordingly, the fact that fair market value rests upon the assessment of an informed buyer requires the conclusion that such "buyer" would investigate the condition and costs associated with the property in question; the valuation as submitted by Plaintiff to the Connecticut Superior Court should be considered to have taken into account any devaluation of the real property, thereby resolving those damages as part of the deficiency judgment[5]. If the valuation presented to that court did not take into account the environment harms, there either were none or Plaintiff misinformed the Superior Court, and should not now be granted a successive forum for the same damages.

### 3. THE SATISFACTION OF THE JUDGMENT ON THE DEFICIENCY BY DEFENDANT MILO OPERATED TO RESOLVE WITH FINALITY THE ISSUE OF ENVIRONMENTAL LIABILITY OF DEFENDANT MILO AS TO THE CONDITION OF THE ASHFORD REAL PROPERTY.

---

[5] Actual knowledge of the environmental condition is not a component of fair market value, however, the Plaintiff had actual knowledge of an environmental problem (Exhibits O and E). For example, Thomas O'Connor, an environmental analyst at the State of Connecticut Department of Environmental Protection, sent a letter to the Plaintiff in April of 1996, describing environmental concerns at the Ashford real property. See Thomas O'Connor Letter (Attached as Exhibit B). Regardless of the accuracy of the contents of the letter, the letter itself put the

17

17086.001/363375.1

The essential facts for analyzing this argument are:

(1)     After entry of the deficiency judgment in favor of Plaintiff against Defendant Milo, Plaintiff presented settlement terms to Defendant Milo; Adams Letter, attached as Exhibit K;

(2)     The settlement agreement required Defendant Milo to provide a release with his negotiated payment in satisfaction of the judgment, and this he did; Release, attached as Exhibit L; and

(3)     Upon Defendant Milo's satisfaction of the terms of the settlement, Plaintiff provided him with a Satisfaction of Judgment; Satisfaction of Judgment, attached as Exhibit M

Pursuant to Connecticut Superior Court Rules Section 23-19, a party seeking a deficiency judgment in a foreclosure action must ascertain and establish the value of the property being foreclosed. This rule stems from the statutory provisions governing deficiency judgment actions; specifically, Conn. Gen. Stat. § 49-14(a) provides that at the hearing on the motion for a deficiency judgment, "the court shall hear the evidence, establish a valuation for the mortgaged property and shall render judgment for the plaintiff for the difference, if any, between such valuation and the plaintiff's claim." Conn. Gen. Stat. § 49-14(a). As the Supreme Court of Connecticut has held, "As a necessary element of [a plaintiff's] claim for a deficiency, the plaintiff [is] required to prove that the property was worth less than the amount of the debt on the date of the vesting of title." *Eichman v. J & J Building Co.*, 216 Conn. 443, 451 (1990). Accordingly, Plaintiff had the obligation of representing an accurate valuation of the Ashford real property to the Connecticut Superior Court, when it sought the deficiency judgment on the property in 1997.

---

Plaintiff on alert, giving notice of environmental concerns at the Ashford real property. Plaintiff's valuation submitted for the purpose of the deficiency judgement should have reflected any environmental concerns.

18

17086.001/363375.1

By settling the deficiency judgment, and supplying the Satisfaction of Judgment to the Superior Court of Connecticut, Plaintiff resolved with finality all claims against Defendant Milo as to any obligations arising in relation to the Mortgage. As described above, Connecticut law affirmatively provides the limitation, precluding any other form of recovery. Additionally, the plain language of the settlement framed by Plaintiff states that it was "settlement in full of [Defendant Milo's] individual obligations[.]" Adams Letter (Attached as Exhibit K). Accordingly, as a matter of law, Defendant Milo has settled his liability with respect to the Ashford real property, and is therefore entitled to summary judgment, having contractually extinguished his obligations.

Plaintiff submitted a Satisfaction of Judgment to the Connecticut Superior Court, after Defendant Milo satisfied the deficiency judgment on the Ashford real property Note and Mortgage via settlement with Plaintiff. Satisfaction of Judgment (Attached as Exhibit M). This settlement extinguished all claims under the Mortgage and Note, at a time when Plaintiff was aware of environmental concerns at the Ashford real property.

Based upon the stipulated valuation of the Ashford real property, the Connecticut Superior Court determined that Defendant Milo was liable as a Guarantor of the Note for a total of $225,665.26 (Two Hundred Twenty Five Thousand Six Hundred Sixty Five Dollars and Twenty Six Cents). Corrected Memorandum of Decision, at 8 (Attached as Exhibit J). Subsequently, Plaintiff offered to settle Defendant Milo's obligations for $217,500.00 (Two Hundred Seventeen Thousand Five Hundred Dollars) and an executed release. Adams Letter (Attached as Exhibit K). As Plaintiff wrote, the settlement was to be considered "as settlement in full of [Defendant Milo's] individual obligations in [the] matter." Adams Letter. Accordingly, this Court should accept that Plaintiff set the terms for Defendant Milo's release from obligations

19

within the scope of the Mortgage and Note upon which the Connecticut Superior Court had awarded the deficiency judgment.

Plaintiff presented its terms to Defendant Milo, and when he satisfied those terms, Defendant Milo extinguished any further duty relating to damages arising within the scope of the Mortgage and Note on the Ashford real property. No matter what light is cast upon these facts, the result looks the same; Plaintiff got what it bargained for from Defendant Milo in full satisfaction of any and all obligations relating to the Ashford real property.

Plaintiff was aware of environmental concerns at the Ashford real property when it sought the deficiency judgment on the Ashford real property and when it settled the deficiency judgment. For example, Thomas O'Connor, an environmental analyst at the State of Connecticut Department of Environmental Protection, sent a letter to the Plaintiff in April of 1996, describing environmental concerns at the Ashford real property. See Thomas O'Connor Letter (Attached as Exhibit O). Regardless of the accuracy of the contents of the letter, the letter itself put the Plaintiff on alert, giving notice of environmental concerns at the Ashford real property. Plaintiff's valuation submitted for the purpose of the deficiency judgement should have reflected any environmental concerns.

Plaintiff's recovery in the Deficiency Judgment was based upon the stipulated value of $795,000.00 (Seven Hundred Ninety-Five Thousand Dollars), See Corrected Memorandum of Decision, *The Cadle Company of Connecticut, Inc. v. Ashford Development Co.*, No. CV-94-56277S (August 15, 1997) (Attached as Exhibit J), which represents a substantial decrease in value from the $3,000,000.00 (Three Million Dollars) that the real property was initially securing under the note. Whereas Plaintiff already recovered for the decline in value of the real property pursuant to the deficiency judgment, which was based upon a value submitted to the Superior

Court while Plaintiff was aware of environmental concerns at the Ashford real property, this Court should hold that Plaintiff cannot receive compensation for this damage again. To permit Plaintiff to recover for any environmental damage would be to permit Plaintiff multiple recoveries for the same damages.

Permitting a second recovery in this case on the devaluation of the Ashford real property due to environmental harms would be improper as against public policy. As the Connecticut Supreme Court has held, "[A] plaintiff may be compensated only once for his just damages for the same injury." *Gionfriddo v. Gartenhaus Cafe*, 211 Conn. 67, 71 (1989) (internal citations omitted).

### 4. AS A MATTER OF LAW, THE DOCTRINE OF COLLATERAL ESTOPPEL BARS THE PLAINTIFF'S ACTION AND DEFENDANT MILO IS ENTITLED TO SUMMARY JUDGMENT ON HIS TENTH AFFIRMATIVE DEFENSE.

Because any depreciation in value of the Ashford real property due to environmental harms was recoverable by Plaintiff as part of the deficiency judgment adjudicated by the Connecticut Superior Court, and because the cost of any environmental remediation was recoverable as debt under the terms of the Mortgage, these items were part of the damages available to Plaintiff in the previously litigated State action. Whereas, Plaintiff and Defendant Milo resolved the issue of damages in that civil litigation, collateral estoppel bars the Plaintiff from asserting these damages under CERCLA in the present action.

The essential facts to the assessment of this argument are:

(1) Plaintiff received a deficiency judgment relating to the Ashford real property against Defendant Milo on August 15, 1997; Corrected Memorandum of Decision; (Exhibit J) and

(2) Plaintiff currently asserts environmental harm to that same property as the basis for all of its counts in this action; (See Amended Complaint).

As a matter of law, it is irrelevant that the form of the action seeking damages is different in the State and Federal forums. The statutory action created by federal CERCLA provisions and the State foreclosure and deficiency actions overlap when it comes to the issue of environmental damages. In fact, Plaintiff's remedies available under the State action were greater in scope than those available under the theory that Plaintiff currently asserts. In the State action Plaintiff could seek the equity of foreclosure, the damages at law on the debt (which, by contract, included, without limitation, any expenses due to environmental reclamation), and the deficiency in value of the real property (which included, but was not limited to, any decrease due to environmental contamination). See generally, *Union Trust Company v. Precast Inc.*, 1995 Conn. Super. LEXIS 1294, at 10 (No. CV-94-0064387 1995) (describing the relief available to a mortgagee under Connecticut law). Accordingly, the environmental damages permitted under CERCLA represent a subset of the remedy available in the prior State court proceedings. As Plaintiff already had its day in court against Defendant Milo on the issue of damages relating to the condition of the Ashford real property and the debt on the Mortgage, the doctrine of collateral estoppel precludes Plaintiff from seeking the damages in the present forum, regardless of the theory of liability under which Plaintiff proceeds.

1. THE DOCTRINE OF COLLATERAL ESTOPPEL APPLIES TO BAR THE PLAINTIFF'S ACTION, BECAUSE (1) THE ISSUES OF LIABILITY AND DAMAGES WERE FULLY AND FAIRLY LITIGATED BEFORE THE CONNECTICUT SUPERIOR COURT, (2) THE ISSUES WERE DECIDED BY THE COURT, AND (3) THOSE DECISIONS WERE NECESSARY TO THE DEFICIENCY JUDGMENT.

This Court should grant Defendant Milo's Motion for Summary Judgment, because collateral estoppel precludes Plaintiff from seeking damages in the present action. As stated above, the elements necessary to establish collateral estoppel are: (1) the issue must have been fully and fairly litigated in a prior proceeding, (2) the issue must have been decided, and (3) the decision must have been necessary to the judgment. *Virgo*, 209 Conn. at 501. Each of these elements is present in the scenario at hand.

      a. The Issues of Damages and the Liability for those Damages were Fully and Fairly Litigated.

The issues of damages and the liability for those damages were fully and fairly litigated in the prior State court action on the deficiency judgment. In the action on the deficiency judgment in the Connecticut Superior Court, Plaintiff stipulated to the valuation of the Ashford real property at $795,000.00 00 (Seven Hundred Ninety-Five Thousand Dollars). See Corrected Memorandum of Decision, *The Cadle Company of Connecticut, Inc. v. Ashford Development Co.*, No. CV-94-56277S (August 15, 1997) (Attached as Exhibit A). Likewise, the value of the mortgage debt was litigated in order to determine the deficiency. See *Id.*

Plaintiff had the opportunity, under Connecticut law, to supply whatever admissible evidence it chose in order to meet its burden of establishing the valuation of the property and the value of the mortgage debt. See *Eichman*, 216 Conn. at 450-51. In supporting its case, Plaintiff could have properly included evidence as to costs of environmental remediation as a proper part of the mortgage debt pursuant to the terms of that contract, and could have asserted a different

23

17086.001/363375.1

valuation of the Ashford real property, in the event that the Plaintiff believed that the stipulated value did not account for environmental damage. The State court was left to rely on the facts that the Plaintiff did present, and rendered its decision on these damages based upon the facts established by the Plaintiff in meeting its burden of proof on the deficiency.

The issue of damages related to the Ashford real property was fully litigated in order to establish the deficiency. The fact that the parties stipulated to the fact that the property value had decreased from the $3,000,000.00 (Three Million Dollars) value that it secured in the Note to the $795,000.00 (Seven Hundred Ninety-Five Thousand Dollars) value proved in the deficiency action, establishes that the issue of any change in condition of the Ashford real property was properly within the scope, and decided as part of the deficiency judgment proceedings.

Likewise, the issue of the mortgage debt, which properly included any environmental costs (see Argument, supra, at B(1)(e)(i)), was litigated as well; accordingly, Plaintiff had the full and fair opportunity to investigate, establish, and claim any environmental costs as part of the mortgage debt aspect of damages in the deficiency judgment action decided between these parties by the Connecticut Superior Court.

Additionally, the issue of liability for the obligations arising under the Mortgage was also fully and fairly litigated. The parties presented argumentation on the issue of liability, and this was discussed in the Superior Court's decision on the matter. Corrected Memorandum of Decision, *The Cadle Company of Connecticut, Inc. v. Ashford Development Co.*, No. CV-94-56277S (August 15, 1997) (Attached as Exhibit J).

  b. The Issues of Damages and Liability were Decided.

The Superior Court indeed decided the issues of valuation and liability regarding the

Mortgage obligations, which resulted in the award of damages in the deficiency judgment action. The determination of valuation is ultimately a question for the trier-of-fact in a deficiency judgment action. See *Eichman*, 216 Conn. at 451-52; *Hartford Federal Savings and Loan Assn. v. Tucker*, 196 Conn. 172, 183, cert. denied, 474 U.S. 920 (1985). The trial court may refuse to accept the valuation supplied by any party in a deficiency action in the event that the evidence is not credible or not supported by fact. *Eichman*, at 450-52; *New Haven Savings Bank v. West Haven Sound Development*, 190 Conn. 60, 71-72 (1983). Accordingly, by accepting the stipulation on the valuation of the Ashford real property, and the figure supplied as the value of the mortgage debt, the Superior Court credited those facts. Moreover, the Superior Court decided that the defendants in the deficiency action were liable for the damages calculated based upon the valuation figure and the mortgage debt figure. Corrected Memorandum of Decision, *The Cadle Company of Connecticut, Inc. v. Ashford Development Co.*, No. CV-94-56277S (August 15, 1997) (Attached as Exhibit J). That said, the Connecticut Superior Court decided the issues of liability and damages in the action on the deficiency judgment between these parties.

c. The Decisions on Liability and Damages were Necessary to the Deficiency Judgment.

The deficiency judgment also satisfies the third and final prong of the collateral estoppel analysis. The decisions of the Superior Court on the issues of liability and damages were necessary to the deficiency judgment. A plaintiff must prove that the property was worth less than the amount of the debt in order to be granted a deficiency judgment. Eichman, 216 Conn. at 451. Accordingly, the trial court must decide (1) the valuation of the property, (2) the value of the mortgage debt, and (3) liability for a plaintiff to recover a deficiency. Therefore, the decision on the damages owed as a function of the value of the property and the amount of the debt under

25

17086.001/363375.1

the Mortgage was necessary in the prior Connecticut Superior Court proceedings between the parties to the present action, as was the determination of liability.

Whereas the Superior Court of Connecticut previously adjudicated the issue of Defendant Milo's liability for damages, and the scope of the damages themselves, which included environmental harms; and whereas the adjudication satisfies all of the elements required by the doctrine of collateral estoppel, this Court should grant Defendant Milo's Motion for Summary Judgment. Plaintiff is estopped from re-opening the issue of the scope of damages for which Defendant Milo could be held liable, as the issue was litigated in the deficiency judgment action. Again, the forum and form of the action are irrelevant, because, as a matter of law, any liability for environmental damages would have arisen as an obligation under the Mortgage, and those obligations were finally resolved by the judgment of the Superior Court of Connecticut.

### 2. THIS COURT SHOULD EMPLOY THE PERSUASIVE LOGIC OF THE CONNECTICUT SUPREME COURT IN *VIRGO V. LYONS*, 209 CONN. 497 (1988), IN GRANTING DEFENDANT MILO'S MOTION FOR SUMMARY JUDGMENT ON COLLATERAL ESTOPPEL GROUNDS.

This application of collateral estoppel is well illustrated by the Supreme Court of Connecticut's holding in *Virgo v. Lyons*, 209 Conn. 497 (1988). In *Virgo* the Plaintiff had filed a federal action under 42 U.S.C. § 1983, for deprivation of his civil rights at the hands of the defendant police officers, and was awarded damages in that action before the United States District Court for the District of Connecticut. *Virgo*, at 498-499. That Plaintiff subsequently filed suit against the same defendants in Connecticut Superior Court sounding in negligence and assault and battery, which related to the same incident that had formed the basis of the § 1983 claim. *Id.* The defendants asserted collateral estoppel, claiming that the plaintiff could only seek recovery once for the damages stemming from the incident; the plaintiff argued that collateral estoppel did not apply, because the federal and State claims sounded under different theories, and

claimed different damages (specifically, restitution for the deprivation of civil rights in the federal suit, contrasted against the physical harm claimed under the State tort theories). *Virgo*, at 501, 504. In holding that the lower court's granting of summary judgment in favor of the defendants on the basis of collateral estoppel was appropriate, the Supreme Court of Connecticut described the doctrine of collateral estoppel,[6] stating:

> The doctrines of res judicata and collateral estoppel protect the finality of judicial determinations, conserve the time of the court, and prevent, wasteful re-litigation. Res judicata or claim preclusion prevents a litigant from reasserting a claim that has already been decided on the merits. Collateral estoppel, or issue preclusion, prevents a party from re-litigating an issue that has been determined in a prior suit.

*Virgo*, 209 Conn. at 501. The Court went on to describe the elements of collateral estoppel, stating:

> For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment.

*Id.*

In applying the doctrine of collateral estoppel to the facts in *Virgo*, the Supreme Court of Connecticut recognized that the damages available under § 1983 were not entirely identical to

---

[6] This doctrine is by no means unique to Connecticut. The federal courts adhere to this rule of fairness and efficiency as well. As the United States Court of Appeals for the Second Circuit has explained, "The doctrine of "[c]ollateral estoppel, or issue preclusion, bars the re-litigation of issues actually litigated and decided in the prior proceeding, as long as that determination was essential to that judgment." *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995). The United States Supreme Court has emphasized that:

> Application of both [the] doctrines [of res judicata, or claim preclusion, and collateral estoppel, or issue preclusion] is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

*Montana v. United States*, 440 U.S. 147, 153-54 (1979) (footnote and citations omitted).

27

17086.001/363375.1

those available under the State claims, and noted that the litigated federal claim actually offered more comprehensive damages than the State tort claims. *Virgo*, at 503. The scope of the damages available in the subsequent State action was actually a subset of the damages available in the original federal case. Despite the fact the issue of damages was not identical in every way, the Court held that the damages in the State action were of a nature that remedied the same injuries between the same parties as had already been decided in the federal action. *Id.*, at 507. The *Virgo* Court noted that "[a]lthough the plaintiff may be dissatisfied with the damages he received in the federal court action, the fact remains that he has already litigated the issue of damages and he cannot re-litigate that issue." *Virgo*, 209 Conn. at 509. This reasoning applies to the case at bar. Permitting plaintiffs to raise successive claims under differing theories, when damages have already been adjudicated is simply prohibited by the long-standing doctrine of collateral estoppel. Moreover, in a situation in which State damages would be re-litigated in federal court, collateral estoppel is bolstered by the need for comity. This Court should respect the finality of the resolution of the issue of damages in the State court, just as this Court would respect its own prior ruling. Plaintiff should not be permitted to forum shop in order to receive damages already litigated and settled.

> D. **AS A MATTER OF LAW, DEFENDANT MILO IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FIRST, SECOND, AND THIRD COUNTS, BECAUSE HE IS NOT A LIABLE PARTY UNDER CERCLA[7].**

The Plaintiff avers that Defendant Milo has personal liability by reason of the demolition of a barn, restaurant and house and the subsequent burning of some of the demolition material and alleged burial of the residue which occurred after August 23, 1988 and before May 3, 1990,

the date of an over-flight photograph. However, Defendant Milo asserts that, as a matter of law, a 10% shareholder who did not participate in or observe any operations involving such activities, cannot be personally liable under the *Bestfoods* decision.

The following facts are not in dispute:

(1)   Defendant Milo is a minority shareholder in Defendant Ashford (Milo Affidavit, Exhibit R); and

(2)   Defendant Milo did not observe or participate in the demolition of the barn, restaurant or house or the disposition of the debris therefrom (Milo Affidavit, Exhibit R).

Defendant Milo was a minority shareholder in defendant Ashford, a corporation created for the development of the property at issue in Plaintiff's action. Defendant Milo's Affidavit ("Milo Affidavit"), ¶¶ 4, 6. Defendant Milo's interest in the Corporation was limited to a ten percent (10%) share during the relevant time period. Milo Affidavit, ¶ 6. Defendant Milo did not manage the day-to-day operations of defendant Ashford during the period alleged by the Plaintiff to be associated with hazardous waste activities. (Milo Affidavit, ¶¶ 6-9). Defendant Milo did not participate in the operations involving the razing of the buildings or the disposal of the remains of the structures. Milo Affidavit, ¶ 10.

Plaintiff inaccurately alleges that Defendant Milo elected to bury the remains of demolition material at the property. Amended Complaint, ¶ 41. However, Plaintiff has not produced any material facts supporting that allegation to create a genuine issue of material fact.

Further, Plaintiff has not produced any evidence that Defendant Milo managed, conducted or directed hazardous waste disposal operations for defendant Ashford. To the contrary, Defendant Milo did not manage, conduct or direct environmental activities at the

---

[7] Defendant Milo adopts the argument put forth by Attorney Berglass' Motion for Summary Judgment as that argument pertains to the mutual exchange of release which equally applies to Defendant Milo. However, Defendant

29

17086.001/363375.1

property including, but not limited to, any activities related to pollution or operations having to do with leakage or disposal of hazardous waste or decisions about compliance with environmental regulations. Milo Affidavit, ¶¶ 6-14.

CERCLA imposes liability on any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed. 42 U.S.C. § 9607(a) et seq. In the leading case of *Bestfoods*, a unanimous United States Supreme Court established the benchmark definition for an operator under CERCLA. The *Bestfoods* Court, in finding that a parent company was not liable as an operator under the statute for the actions of its subsidiary, held:

> [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Bestfoods*, 542 US., at 66-67. As the decision's broad language indicates, this definition of operator is not limited to the parent-subsidiary corporation context. See *US. v. Green*, 33 F.Supp. 2d 203, 216-218 (W.D.N.Y. 1998).

Defendant Milo did not manage, direct or conduct operations involving the disposal of hazardous waste. Milo Affidavit, ¶¶ 6-14. Defendant Milo directs the Court's attention to the fact that the order issued to the Plaintiff by DEP asserts a violation of solid waste, not hazardous waste, laws. (Exhibit P). The Plaintiff's only relevant allegation (which allegation is inaccurate) supporting potential liability under CERCLA and *Bestfoods* is that Defendant Milo elected to

---

Milo's additional argument below uses a reduced set of facts to support its Summary Judgment Motion.

bury the debris from the razed buildings. Plaintiff's Amended Complaint, ¶ 41.[8] Plaintiff has not produced any material facts that support that allegation. In fact, Plaintiff has not produced any evidence that Defendant Milo operated environmental matters for Defendant Ashford, as required under CERCLA and *Bestfoods*. Defendant Milo did not manage waste disposal at the property, nor did he observe or participate in the operation razing the structures or disposing of the remains of the buildings. Milo Affidavit, ¶¶ 6-10.

Defendant Milo was a minority shareholder in Defendant Ashford, owning a ten percent (10%) share of the stock in the corporation during the relevant time period. Milo Affidavit, ¶ 6 Defendant Milo did not control Ashford, and Defendant Milo did not dominate its affairs or direct its course of action. Milo Affidavit, ¶¶ 6-14. Therefore, Defendant Milo could not use Defendant Ashford to accomplish illegitimate or illegal goals. Any allegations to the contrary are unsupported by any evidence. See Plaintiff's Amended Complaint, ¶ 64.

Piercing the corporate veil is an equitable doctrine that is used sparingly. *KLM Industries, Inc. v. Tylutki*, 75 Conn. App. 27, 33, 815 A.2d 688 (2003); *Joslyn Mfg. Co. v. T.C. Jones & Co., Inc.*, 813 F.2d 80, 83-84 (5th Cir. 1990). Under Connecticut law the corporate veil may be pierced under either the instrumentality theory or identity theory.[9] The instrumentality theory allows a Court to disregard the corporate form and reach individual shareholders, officers and/or directors when the individual so controls and dominates the corporation that the corporation has no separate will, mind, or existence. *KLM Industries. Inc. v. Tylutki*, 75 Conn. App. 27, 33, 815 A.2d 688 (2003); *Hersey v. Lonrho Inc.*, 73 Conn. App. 78, 807 A.2d 1009 (2003), citing *Zaist v. Olson*, 154 Conn. 563, 227 A.2d 552 (1967). Federal law will consider piercing the corporate

---

[8] Plaintiff may argue that CERCLA liability attaches because defendant Milo had limited general input into corporate affairs of Defendant Ashford. The Court should reject Plaintiff's position as inapposite as it is incompatible with CERCLA and *Bestfoods*.

veil by reviewing similar factors. See In Re Acushnet River and New Bedford Harbor Proceed, 675 F.Supp. 22, 33 (D. Mass 1987).

Defendant Milo did not control or dominate Defendant Ashford corporation. Defendant Milo was a minority shareholder with limited input into corporate affairs and did not manage Defendant Ashford with regard to environmental operations. Milo Affidavit, ¶¶ 6-10. Given Defendant Milo's limited role in the corporation especially with regard to environmental concerns, there is no basis to pierce the corporate veil as against Defendant Milo. Defendant Milo is entitled to summary judgment on Plaintiff's second count.

IV. CONCLUSION

For the reasons set forth above, the Court should weigh the impact of the *Aviall* decision pending before the U.S. Supreme Court. However, aside from *Aviall*, Defendant Milo has asserted arguments upon which there are no disputed facts and his Motion for Summary Judgment should be granted.

> RESPECTFULLY SUBMITTED
> DEFENDANT, ANTHONY M. MILO
>
> By: _____
> Thomas M. Armstrong
> Fed. Bar No. ct03545
> Reid and Riege, P.C.
> One Financial Plaza
> Hartford, CT 06103
> Tel (860) 278-1150  Fax. (860) 240-1002

---

[9] Plaintiff appears to be relying on the instrumentality theory in plaintiff's amended complaint. *See* Amended Complaint, ¶ 64. The identity theory is usually applied in situations involving two corporations, a circumstance not present in this action.