UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CADLEROCK PROPERTIES JOINT VENTURE, L.P. | : | |
| | : | |
| V. | : | |
| | : | |
| BENJAMIN SCHILBERG; SCHILBERG INTEGRATED METALS, CORP.; THOMAS NIGRO; ASHFORD DEVELOPMENT CO.; DENNIS V. LOVELY; ANTHONY M. MILO; JAMES A. STEVENS; WILSON MORIN; JEAN G. MARTIN; DAVID W. FLORIAN; THOMAS STANTON, JR.; CHRISTIAN R. BRAYFIELD; CHARLES HILL; and SUBURBAN EXCAVATORS, INC. | : : : | CASE NO. 3:01cv896 (MRK) |
| | : | JUNE 14, 2005 |

## MOTION FOR LEAVE TO FILE SUPPLEMENTAL MEMORANDUM IN FURTHER OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS

Plaintiff, CadleRock Properties Joint Venture, L.P. ("CadleRock"), respectfully moves for leave to file a supplemental memorandum of law in further opposition to Defendants' motions for judgment on the pleadings.

Plaintiff has good cause for the granting of this motion. Argument is currently scheduled on the aforementioned motions before the Honorable Judge Kravitz on June 21, 2005. Although briefing on the motions concluded on April 8, 2005, several decisions have come down since then that are highly relevant to the issues raised in the Parties' briefs. Plaintiff intends to refer to these decisions during oral argument.

Attached hereto as Exhibit A is Plaintiffs' proposed memorandum of law, in the form of a letter to Judge Kravitz, in support of this motion. Appended to the letter/memorandum are two unreported decisions cited in the letter/memorandum.

WHEREFORE, CadleRock respectfully requests that the Court grant its motion for leave to file a supplemental memorandum of law in further opposition to Defendants' motions for judgment on the pleadings.

PLAINTIFF, CADLEROCK PROPERTIES
JOINT VENTURE, L.P.

Jill Hartley
Fed. Bar No. CT 10570
Michael G. Albano
Fed. Bar No. CT 21440
Sabia & Hartley, LLC
190 Trumbull Street, Suite 202
Hartford, CT 06103
Telephone: (860) 541-2077
Facsimile: (860) 713-8944

2

## CERTIFICATION

I hereby certify that a copy of the foregoing has been sent this 14th day of June, 2005 by facsimile to all counsel of record and by US Mail to pro se party as follows:

Thomas A. Armstrong, Esq.
Reid & Reige, P.C.
One State Street - 18th Floor
Hartford, CT 06103-3185

John David Biller, Esq.
Biller, Sachs, Raio & Bonadies
2750 Whitney Avenue
Hamden, CT 06518

Joseph F. DePaolo, Jr., Esq.
132 Main Street
P.O. Box 554
Southington, CT 06489

Joseph B. Sappington, Esq.
Levy & Droney, P.C.
74 Batterson Park Road
Farmingon, CT 06034-0887

Steven Berglass, Esq.
Seeley & Berglass
121 Whitney Avenue
New Haven, CT 06510

Thomas Nigro
Pro Se Party
7 Howard Road
Ashford, CT 06278

Thomas S. Luby, Esq.
Luby, Olson, P.C.
405 Broad Street
P.O. Box 2695
Meriden, CT 06450

Michael G. Albano

E:\WPDOCS\CADLE\ASHFORD\CERCLA\mot.leave.amend.beyond.scope.wpd

3

190 Trumbull Street    Suite 202    Hartford, CT 06103-2205
tel 860.541.2077    fax 860.713.8944
www.sabiahart.com

June 14, 2005

**By Hand Delivery**

Hon. Mark R. Kravitz
United States District Court
141 Church Street
New Haven, CT 06510

Re:    Cadlerock Properties Joint Venture, L.P. v. Schilberg, et al.
       Case No. 3:01CV896 (MRK)

Dear Judge Kravitz:

This law firm represents Plaintiff in this lawsuit. Oral argument is scheduled before Your Honor on Tuesday, June 21, 2005 at 1:30 p.m. with regard to Defendants' Motion for Judgment on the Pleadings and other related motions.

Although briefing on these motions concluded on April 8, 2005, several decisions have come down since then that are highly relevant to the issues raised in the parties' briefs. Plaintiff intends to refer to these decisions during oral argument.

In Syms v. Olin Corp., — F.3d —, 2005 WL 1164011 (2d Cir. May 18, 2005),[1] the Court of Appeals for the Second Circuit recently discussed whether its holding in Bedford Affiliates v. Sills, 156 F.3d 416 (2d Cir. 1998), remains good law in light of the holding of Cooper Indus., Inc. v. Aviall Servs., Inc., 125 S.Ct. 577 (2004).[2] Although the Syms Court declined to decide

---

[1]     A copy of the Syms decision is enclosed.

[2]     The Bedford Court held, inter alia, that a PRP may not bring a cost-recovery claim imposing joint and several liability under § 107, but is instead limited to a contribution claim under § 113. Bedford, 156 F.3d at 424.

Exhibit A

OF COUNSEL   Eileen G. Ferris | Gil B. Fried

ATTORNEYS   Randall J. Sabia | Jill Hartley | Edward C. Taiman, Jr. | Eileen C. Moskey | Michael G. Albano | John P. Shea, Jr. | Lori Rittman Clark

SABIA & HARTLEY, LLC
ATTORNEYS AT LAW

Hon. Mark R. Kravitz
Page Two
June 14, 2005

the issue because the Aviall decision was issued after oral argument and, therefore, was not fully briefed or argued, the Syms Court tipped its hand in a footnote as to how it might view Bedford at some point when the issue is fully before it:

> Together, Cooper Industries [Aviall] and Bedford Affiliates leave a PRP with no mechanism for recovering response costs until proceedings are brought against the PRP. This might discourage PRPs from voluntarily initiating clean-up, contrary to CERCLA's stated purpose of "induc[ing] such persons voluntarily to pursue appropriate environmental response actions with respect to inactive hazardous waste sites." H.R. Rep. No. 96-1016(I), at 17 (1980), reprinted in 1980 U.S.C.C.A.N. 6119, 6120. This is because if a PRP remediates a facility on its own initiative, it reduces the likelihood that it will be sued under § 106 or § 107(a), and thereby jeopardizes its opportunity to seek contribution under § 113(f) from other PRPs. The combination of Cooper Industries and Bedford Affiliates, if the latter remains unaltered, would create a perverse incentive for PRPs to wait until they are sued before incurring response costs.

Syms v. Olin Corp., 2005 WL 1164011, at * 8, n. 8.

Based upon the Syms Court's apparent willingness to revisit Bedford in light of the holding in Aviall, this Court need not hesitate to find that the holding of Bedford does not preclude a PRP from bringing a claim for contribution under § 107(a)(4).

Two district courts have recently squarely addressed the issue of whether a PRP that is denied a contribution claim under § 113(f) under the holding of Aviall may, nonetheless, pursue an implied claim for contribution under § 107(a). In Metropolitan Water Reclamation District of Greater Chicago v. Lake River Corp., 365 F. Supp. 2d 913 (N.D. Ill. 2005), the Court held that a

Hon. Mark R. Kravitz
Page Three
June 14, 2005

plaintiff PRP who voluntarily incurred response costs, and who was barred from a contribution claim under § 113(f) by the holding of <u>Aviall</u>, still had an implied right to pursue a claim for contribution under § 107(a)(4):

> Although PRPs are not explicitly named in § 107(a), there seems to be no reason why they should be excluded from the provision that allows recovery for any person, unless that right was provided elsewhere in the statute. While the majority of judges [in <u>Aviall</u>] were understandably reluctant to decide an issue which could wait another day, I agree with the dissenters in <u>Aviall</u>, insofar as they express a prediction of the result that would occur when the Court had to decide the question, that if the implied right existed before § 113(f)(1) was added and the right was not encompassed by § 113(f)(1), then it must still lie in § 107(a). <u>Aviall</u>, 125 S.Ct. at 588. This is especially true since SARA explicitly preserved all state and federal contribution rights that preexisted the amendment. 42 U.S.C. § 9613(f)(1).

<u>Metropolitan Water Reclamation</u>, 365 F. Supp. 2d at 918. Similarly, in <u>Adobe Lumber, Inc. v. Taecker</u>, No. CV S02-186 GEB GGH, 2005 WL 1367065 (E.D. Cal. May 24, 2005),[3] the Court held that where a plaintiff was precluded by <u>Aviall</u> from bringing a § 113(f) claim for contribution, and was precluded from pursuing joint and several liability under § 107 because it was a PRP, that plaintiff could nonetheless pursue a contribution claim under § 107(a):

> <u>Aviall</u> does not foreclose Adobe's contribution claim since the Supreme Court did not rule on whether contribution is available under § 107 . . . Thus, Ninth Circuit precedent governs this issue . . .

---

[3]    A copy of the <u>Adobe Lumber</u> decision is enclosed.

 Hon. Mark R. Kravitz
Page Four
June 14, 2005

> <u>Pinal Creek</u> was explained in <u>Western Properties Service Corp. v. Shell Oil Co.</u>,
> 358 F.3d 678, 685 (9th Cir. 2004) as follows: "<u>Pinal Creek</u> held that the enactment
> of § 113 in 1986 did not replace the implicit right to contribution many courts
> recognized in § 107(a), so that a claim for contribution requires the 'joint operation'
> of both sections." Thus, in the wake of <u>Aviall</u>, Adobe's § 107 claim is construed as
> it was before the congressional enactment of § 113.

<u>Adobe Lumber, Inc.</u>, 2005 WL 1367065, at * 1.

Based on the foregoing decisions, and for all the reasons expressed in Plaintiff's memoranda dated
March 11, 2005 and April 8, 2005, there is ample precedent for this Court to deny Defendants'
motions and to permit Plaintiff contribution claim to move forward to the next stage of this
litigation.

To the extent necessary, Plaintiff respectfully requests that this letter should be deemed to be both a
Supplemental Memorandum of Law in Further Opposition to Defendants' Motions for Judgment
on the Pleadings, and a Motion for Leave to File a Supplemental Memorandum of Law.

Respectfully,

Michael G. Albano

MGA/slm
enclosures

cc:    All counsel of record via facsimile
       Pro se party via regular mail
       E:\WPDOCS\CADLE\ASHFORD\CERCLA\Corr\Kravitz.06.14.05.ltr.wpd

Westlaw.

2005 WL 1164011                                                                                                    Page 1
--- F.3d ----, 2005 WL 1164011 (2nd Cir.(N.Y.)), 35 Envtl. L. Rep. 20,104
(Cite as: 2005 WL 1164011 (2nd Cir.(N.Y.)))

### Briefs and Other Related Documents

United States Court of Appeals,
Second Circuit.
Eileen SYMS, individually and as Administrator of
the Estate of John Syms; the
Somerset Group, Inc.; Unitool Corporation; Lew-Port
Construction Corporation;
C & S Machinery Corporation; Syms Equipment
Rental Corporation; Lew-Port
Electric Corporation, Plaintiff-Appellants,
v.
OLIN CORPORATION; United States Department
of Defense; Donald Rumsfeld, in his
official capacity as Secretary of Defense; United
States Department of the
Army; Thomas E. White, in his capacity as Secretary
of the Army; United States
Department of the Air Force; Dr. James G. Roche, in his
official capacity as
Secretary of the Air Force; United States Nuclear
Regulatory Commission;
Richard Meserve, in his official capacity as chairman
of the United States
Nuclear Regulatory Commission; United States of
America, Defendant-Appellees.
**Docket No. 03-6234.**

Argued: Nov. 16, 2004.
Decided: May 18, 2005.

**Background:** Landowner brought civil rights action against United States and government contractor under state law and Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and Federal Tort Claims Act (FTCA) to recover necessary response costs that owner had allegedly incurred in cleanup of hazardous substances, as well as alleged injury to value of its property. The United States District Court for the Western District of New York, Richard J. Arcara, Chief Judge, granted summary judgment for defendants or otherwise dismissed claims. Landowner appealed.

**Holdings:** The Court of Appeals, Leval, Circuit Judge, held that:

(1) landowner, who had not been sued in CERCLA administrative or cost recovery action, could not obtain contribution from other liable parties;

(2) limitations period to file CERCLA cost recovery action began to run no later than when government sent formal certificate of compliance to owner;

(3) landowner could not recover costs for routine physical maintenance in CERCLA cost recovery action;

(4) repair of damage caused during clean-up of contamination did not give rise to cost recovery action under CERCLA;

(5) costs associated with counsel's efforts were not recoverable in action under CERCLA;

(6) private monitoring of individual's health was not valid response cost under CERCLA;

(7) fact issue existed as to whether landowners incurred necessary response costs while actually admitting government officials and contractors to contaminated site; and

(8) government did not fraudulently lead landowner to believe that its property was free from contamination.

Affirmed in part, vacated in part, and remanded.

**[1] Environmental Law** ⬅447

149Ek447 Most Cited Cases
Private party, who had not been sued in CERCLA administrative or cost recovery action, could not obtain contribution from other liable parties. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 106, 107(a), 113(f)(1), 42 U.S.C.A. §§ 9606, 9607(a), 9613(f)(1).

**[2] Environmental Law** ⬅671
149Ek671 Most Cited Cases
Limitations period for landowner to file CERCLA cost recovery action against United States for all response

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1164011                                                                 Page 2
--- F.3d ----, 2005 WL 1164011 (2nd Cir.(N.Y.)), 35 Envtl. L. Rep. 20,104
(Cite as: 2005 WL 1164011 (2nd Cir.(N.Y.)))

costs resulting from radioactive contamination began to run no later than when government sent formal certificate of compliance to owner. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107(a), 113, 42 U.S.C.A. §§ 9607(a), 9613(g)(2)(B).

[3] Environmental Law ⬤➞446
149Ek446 Most Cited Cases
Landowner could not recover costs that it incurred to patch roadways, mow grass, and plow snow, which helped government contractors access that property, in CERCLA cost recovery action, since owner did not undertake that routine physical maintenance to facilitate clean-up efforts. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a)(4)(B), 42 U.S.C.A. § 9607(a)(4)(B).

[4] Environmental Law ⬤➞446
149Ek446 Most Cited Cases
Repair of damage caused during clean-up of contamination gives rise to an ordinary tort action, not a cost recovery action under CERCLA. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a)(4)(B), 42 U.S.C.A. § 9607(a)(4)(B).

[5] Environmental Law ⬤➞446
149Ek446 Most Cited Cases
Costs incurred to repair damage caused by clean-up crews are not usually recoverable under CERCLA. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a)(4)(B), 42 U.S.C.A. § 9607(a)(4)(B).

[6] Environmental Law ⬤➞720(2)
149Ek720(2) Most Cited Cases
Costs associated with counsel's efforts in reviewing historical documents, analyzing boxes of data related to contamination, attempting to identify other potentially responsible parties (PRPs), commenting on work plans, and facilitating site access, could not be recovered in CERCLA cost recovery action, since such efforts did not uncover identity of any PRPs, site access negotiations primarily protected interests of landowner, and other activities did not qualify as necessary

response costs. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a)(4)(B), 42 U.S.C.A. § 9607(a)(4)(B).

[7] Environmental Law ⬤➞710
149Ek710 Most Cited Cases
Landowner could not maintain CERCLA action to recover costs incurred by its attorneys who hired contractors to perform limited radiological investigation of ditch connected to government property that was suspected of radioactive contamination, since landowner did not reimburse attorneys for those costs and there was no evidence that it was obligated to do so. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a)(4)(B), 42 U.S.C.A. § 9607(a)(4)(B).

[8] Environmental Law ⬤➞446
149Ek446 Most Cited Cases
Private monitoring of individual's health was not valid response cost under CERCLA. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 101, 104(i), 107(a)(4)(B), 42 U.S.C.A. §§ 9601, 9604(i), 9607(a)(4)(B).

[9] Environmental Law ⬤➞446
149Ek446 Most Cited Cases
Time spent on site merely in anticipation that government official or contractor might show up could not be considered necessary response cost under CERCLA; although various site access agreements with government "required" landowners "to be present every business day" to let government officials and contractors onto the property, "requirement" allegedly arose because contractors failed to provide proper notice of their visits as mandated by site access agreement and landowners easily could have avoided need to remain constantly on site by insisting that contractors announce their visits in advance. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107, 42 U.S.C.A. § 9607(a)(4)(B).

[10] Federal Civil Procedure ⬤➞2498.3
170Ak2498.3 Most Cited Cases
Genuine issue of material fact existed as to whether

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

landowners incurred necessary response costs while actually admitting government officials and contractors to contaminated site, precluding summary judgment in CERCLA cost recovery action. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.; Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a)(4)(B), 42 U.S.C.A. § 9607(a)(4)(B).

**[11]** United States ☞78(14)
393k78(14) Most Cited Cases
The date on which Federal Tort Claims Act (FTCA) claim accrues is determined as a matter of federal law. 28 U.S.C.A. §§ 1346(b)(1), 2401(b).

**[12]** Limitation of Actions ☞55(1)
241k55(1) Most Cited Cases

**[12]** Limitation of Actions ☞95(3)
241k95(3) Most Cited Cases
Claims accrue under the Federal Tort Claims Act (FTCA) either at the time of injury or when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the facts giving rise to the cause of action. 28 U.S.C.A. §§ 1346(b)(1), 2401(b).

**[13]** Limitation of Actions ☞95(7)
241k95(7) Most Cited Cases
Limitations period for landowner to file Federal Tort Claims Act (FTCA) claim against United States for radioactive contamination of its property began to run no later than when landowner was aware of that contamination. 28 U.S.C.A. §§ 1346(b)(1), 2401(b).

**[14]** Limitation of Actions ☞55(6)
241k55(6) Most Cited Cases
Limitations period for New York landowner to file Federal Tort Claims Act (FTCA) claim against United States for contamination of its property could not be tolled for alleged continuing violations, since New York law no longer recognized existence of continuing tort doctrine in latent exposure cases seeking money damages. 28 U.S.C.A. §§ 1346(b)(1), 2401(b); N.Y.McKinney's CPLR 214-c.

**[15]** Limitation of Actions ☞95(7)
241k95(7) Most Cited Cases

Landowner knew, or should have known, about other contaminates on its land, for
purpose of application of statute of limitations to its Federal Tort Claims Act (FTCA) action, when landowner had actual knowledge of presence of asbestos and polychlorinated biphenyls (PCBs) on its land; under discovery rule, landowner should have discovered presence of other contaminants through exercise of reasonable diligence where there was history of TNT production near site, asbestos, PCBs, unidentified "odd smelling" liquid, and presence of hazardous waste dump next door. 28 U.S.C.A. §§ 1346(b)(1), 2401(b).

**[16]** Limitation of Actions ☞13
241k13 Most Cited Cases
Government did not fraudulently lead landowner to believe that its property was free from contamination by issuing certificate of compliance to landowner, for purpose of landowner's estoppel claim to toll statute of limitations under Federal Tort Claims Act (FTCA), since certificate only referred to clean-up of radioactive contamination and did not purport to say anything about non-radioactive contamination.

Alan J. Knauf and Linda R. Shaw, Knauf Shaw LLP, Rochester, N.Y. (Ronald L. Kuis, Pittsburgh, PA, on the brief), for Plaintiff-Appellants.

JoAnn T. Sandifer, Husch & Eppenberger, LLC, (David R. Dyroff, Jr., Michael D. Montgomery, on the brief), St. Louis, MO, for Defendant-Appellee Olin Corporation.

David S. Fishback, Assistant Director, Environmental Torts Section, Civil Division, and Todd S. Aagaard, Environment & Natural Resources Division, Department of Justice (Peter D. Keisler, Assistant Attorney General, Civil Division; J. Patrick Glynn, Director, and Timothy B. Walthall, Attorney, Environmental Torts Section, Civil Division; Thomas L. Sansonetti, Assistant Attorney General, and Michele Walter, Attorney, Environment & Natural Resources Division, on the brief), Washington, D.C., for Federal Appellees.

Before: FEINBERG, LEVAL, STRAUB, Circuit Judges.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4

LEVAL, Circuit Judge.

*1 Plaintiff-appellants, all persons and entities related to John Syms and the Somerset Group (collectively "Somerset"), appeal from the grant of summary judgment by the United States District Court for the Western District of New York (Richard J. Arcara, *J.*) in favor of the defendant-appellees (collectively "defendants"). The suit sought primarily to recover necessary response costs Somerset had allegedly incurred in the cleanup of hazardous substances, as well as alleged injury to the value of Somerset's property. The judgment dismissed the claims brought under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) and the Federal Tort Claims Act (FTCA); the court declined to exercise supplemental jurisdiction over the state law claims against defendant-appellee Olin Corporation. We affirm in part because (1) Somerset is not eligible to seek contribution under CERLCA § 113(f); (2) its radioactive contamination claims under CERCLA are time-barred; (3) other costs it incurred are not recoverable under CERCLA; and (4) its claims under FTCA are time-barred. We vacate in part and remand because a genuine issue of material fact exists as to whether Somerset incurred recoverable necessary response costs in admitting government officials and contractors onto its property.

## BACKGROUND

In 1942, the United States Department of War purchased 7500 acres in Niagara County, New York to establish the Lake Ontario Ordnance Works (LOOW). The Department of War used approximately 2500 acres for a TNT plant and related military activities, leaving the remaining 5000 acres as a buffer zone. TNT production at LOOW ceased in 1943, and the site was thereafter used for the disposal of radioactive waste from uranium processing operations associated with the Manhattan Project and various contaminants from the Army's chemical warfare service. Waste was left in drums that sat along the roadside for months, in a cooling tower not designed to hold hazardous materials, and in outdoor piles. The government also dug a series of trenches to drain radioactive waste into the Central Drainage Ditch, which flowed into several nearby creeks.

During the 1950s, Olin Corp. operated an experimental fuel production facility at LOOW, which manufactured aviation fuel using boron. The government cancelled Olin's contract before the plant became fully productive, but Olin remained at LOOW to perform decommissioning activities that included dumping, burying, and burning various chemicals.

In 1966, the government sold 564 acres of LOOW to Fort Conti Corp., which is not a party to this suit. Fort Conti in turn sold 132 acres to Somerset Group in 1970, which was owned by John Syms. Syms also owned or controlled the other plaintiff corporations.

Somerset renovated the buildings on the site between 1970 and 1972 and eventually opened the Lew-Port Industrial Park. In April 1972, the New York Department of Health issued an order restricting the use of the site, citing concern about exposure to radioactive material. The Department of Health instructed Somerset not to develop the property any further or to allow any existing uses to expand. It further specified that decontamination efforts undertaken by anyone other than the government could proceed only with the express approval of the Department of Health.

*2 Somerset cancelled its tenants' leases, extended fencing around the entire site, and hired guards to secure the property. John Syms then mounted a lobbying campaign in Albany and Washington, D.C. to obtain relief. In 1974, the Department of Health issued a supplementary order authorizing Somerset to resume commercial and industrial activities on most of the site. The order continued to prohibit construction in the areas around the Central Drainage Ditch and Six Mile Creek. After issuance of the order, Somerset began attracting new tenants, but in late 1974 the Town of Lewiston cut off the water supply to the site out of concern that contamination would enter the water while it circulated through the site.

Somerset filed for bankruptcy in 1980. At the prompting of the bankruptcy court, Somerset sold 93 acres of the site to its neighbor, which operated an industrial waste landfill on the adjacent property.

Between 1982 and 1984, the government began to

consolidate radioactive contamination across LOOW into a 191-acre area known as the Niagara Falls Storage Site (NFSS). The NFSS is located a half-mile from the site and connected to it by the Central Drainage Ditch. As part of the consolidation, a government contractor removed soil and silt along the Central Drainage Ditch and several other parts of the property. The Department of Energy wrote to Somerset on December 29, 1986 to inform it that "the results of the post-remedial action radiological surveys have been verified and that remedial action on your property has been satisfactorily completed." The letter explained that the property was "in compliance with the standards and guidelines applicable to the remedial actions at the Niagara Falls Storage Site." It indicated that a "formal certification statement on your property will be forwarded to you in the near future." The certificate was not sent until May 7, 1992.

Meanwhile, Somerset continued pushing for cleanup of the nonradioactive contamination on its property. In 1998, the Army Corps of Engineers commenced a Phase I Remedial Investigation/Feasibility Study and performed interim asbestos abatement on Somerset's property. In 1999, the Army Corps released preliminary results from its investigation at a public meeting where Somerset allegedly learned for the first time that the groundwater was contaminated with lithium and an explosive known as RDX.

On August 25, 1999, Somerset submitted a demand and claim letter to the Department of Justice, seeking to recover response costs it allegedly incurred in the cleanup of hazardous substances and damages for injury to the value of its property. The government denied the claim. Having exhausted its administrative remedies, Somerset filed this suit in the Western District of New York on August 23, 2000. It alleged fifteen causes of action under CERCLA, 42 U.S.C. § 1983, various provisions of New York statutory and common law, and the Federal Tort Claims Act (FTCA). Somerset asserted all fifteen causes of action against the government, and all but four against Olin.

*3 All parties filed for summary judgment. The magistrate judge recommended granting defendants summary judgment on the CERCLA claims, because it

considered Somerset to be a potentially responsible party ineligible for cost recovery under § 107(a), and because Somerset had failed to demonstrate that the response costs it incurred were necessary and in conformance with the national contingency plan. In the alternative, the magistrate judge concluded that Somerset's CERCLA § 107(a) recovery claim was time-barred with respect to radioactive contamination. The magistrate judge also recommended granting the government summary judgment on the § 1983 claim, because § 1983 provides a cause of action against persons acting under color of state law, not persons acting under color of federal law. As for claims under the FTCA, the magistrate judge recommended granting the government summary judgment under the FTCA's two-year statute of limitations. See 28 U.S.C. § 2401(b). In the alternative, the magistrate judge suggested that the discretionary function exception to the FTCA shielded the government from liability, except on Somerset's claim of failure to warn. The magistrate judge recommended that the district court decline to exercise supplemental jurisdiction over the state law claims against Olin.

The district court partially adopted the reasoning of the magistrate judge's report. It granted defendants summary judgment on the CERCLA claims on the ground that Somerset had failed to demonstrate the necessity of its response costs. It granted the government summary judgment on the FTCA claims by reason of untimeliness. Finally, the district court declined to exercise supplemental jurisdiction over the remaining state law claims against Olin. Somerset then brought this appeal.

## DISCUSSION

We review the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to Somerset as the nonmoving party and drawing all reasonable inferences in its favor. *See Anthony v. City of New York,* 339 F.3d 129, 134 (2d Cir.2003).

### I. CERCLA

[1] CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1164011
--- F.3d ----, 2005 WL 1164011 (2nd Cir.(N.Y.)), 35 Envtl. L. Rep. 20,104
(Cite as: 2005 WL 1164011 (2nd Cir.(N.Y.)))

Page 6

(SARA), provides two primary mechanisms for private parties to recover costs incurred in response to the release or threatened release of a hazardous substance: a cost recovery action under § 107(a), and suit for contribution under § 113(f). Somerset filed claims under both § 107(a) and § 113(f) seeking to recover costs incurred for: (1) security fencing installed in the mid-1970s; (2) security guards and guard dogs; (3) the provision of an alternative water supply; (4) the presence of John and Eileen Syms to admit contractors to the site; (5) John Syms's travel to meet with government officials in the late 1970s; (6) a set of as-built drawings purchased in the late 1970s; (7) maintenance of the property; (8) damage caused by workers removing asbestos in 1998; (9) the investigative activities of counsel; (10) a survey conducted in 2000 of radioactive contamination in the Central Drainage Ditch; and (11) future medical monitoring.

*4 While this case was pending on appeal, the Supreme Court held that a private party cannot obtain a judgment for contribution under § 113(f) unless it has been sued under § 106 or § 107(a). _Cooper Indus., Inc. v. Aviall Servs., Inc., --- U.S. ----, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004)._ Because Somerset has not been sued under § 106 or § 107(a), it is ineligible to seek contribution under § 113(f). We therefore affirm the district court's grant of summary judgment to defendants on Somerset's § 113(f) claim, and focus for the remainder of this discussion on Somerset's § 107(a) claim.

Section 107(a) imposes strict liability, subject to certain defenses, on four classes of potentially responsible persons (PRPs): (1) current owners and operators of contaminated facilities; (2) previous owners and operators of such facilities; (3) generators of hazardous substances; and (4) transporters of hazardous substances. 42 U.S.C. § 9607(a); _Bedford Affiliates v. Sills,_ 156 F.3d 416, 423 (2d Cir.1998). The definition of "person" includes the federal government. 42 U.S.C. § 9601(21). A private party may sue a PRP under § 107(a) to recover "necessary costs" of responding to the release, or threatened release, of hazardous substances, "consistent with the national contingency plan." _Id._ § 9607(a)(4)(B); _Bedford_

_Affiliates,_ 156 F.3d at 427.

CERCLA defines the term "response" as encompassing both "removal" efforts and "remedial actions." 42 U.S.C. § 9601(25). Broadly speaking, removal includes efforts to clean up a site, prevent the threatened release of hazardous substances, and dispose of removed material. _Id._ § 9601(23). [FN1] Remedial action includes more permanent efforts to store, confine, recycle, or destroy hazardous substances. _Id._ § 9601(24). [FN2]

### A. Statute of Limitations

[2] The applicable statute of limitations under CERCLA varies depending on whether response costs were incurred in connection with a removal or remedial action. For suits under § 107(a), a plaintiff has three years after completion of a removal action to file suit. 42 U.S.C. § 9613(g)(2)(A). If a remedial action is commenced within three years of the completion of a removal action, the statute of limitations for removal costs is tolled and the plaintiff may recover the removal costs at the time he recovers any remedial costs. _Id._ § 9613(g)(2)(B). A suit to recover remedial costs must be filed within six years after "initiation of physical on-site construction of the remedial action." _Id._

The district court did not discuss the statute of limitations in dismissing Somerset's § 107(a) claims for radioactive contamination, but the magistrate judge concluded that these claims are time-barred. [FN3] We agree with the magistrate judge. _See ACEquip Ltd. v. Am. Eng'g Corp.,_ 315 F.3d 151, 155 (2d Cir.2003) ("Our court may, of course, affirm the district court's judgment on any ground appearing in the record, even if the ground is different from the one relied on by the district court.").

*5 The government completed cleaning Somerset's property in 1986. It informed Somerset of its progress in December 1986, and sent Somerset a formal certificate of compliance on May 7, 1992. Even if the six-year statute of limitations had not begun running until Somerset received the certificate, the time for filing a cost recovery action for all response costs resulting from radioactive contamination expired at the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

latest on May 7, 1998. Somerset did not file its demand and claim letter until August 25, 1999. Its action under § 107(a) with respect to radioactive contamination cleaned up in 1986 is accordingly time-barred. [FN4]

**B. *Necessity of Other Response Costs***

[3] Section 107(a)(4)(B) establishes liability for "*necessary* costs of response." 42 U.S.C. § 9607(a)(4)(B) (emphasis added). The district court concluded that the response costs incurred by Somerset were not necessary to address a threat to human health or the environment. We affirm the judgment of the district court with respect to non-time-barred costs involving physical maintenance of the site; damage caused during asbestos removal; the activities of counsel; the 2000 survey of the Central Drainage Ditch; individual medical monitoring; and time spent on the site merely in anticipation that a government official or contractor might need to be given access. We conclude, however, that a genuine issue of material fact precludes summary judgment with respect to non-time-barred costs incurred in actually providing the government with access to the site.

1. *Physical Maintenance of Site*

Somerset seeks recovery of costs it incurred to patch roadways, mow grass, and plow snow. This routine physical maintenance helped government contractors access Somerset's property. Somerset has not demonstrated, however, that it undertook the maintenance to facilitate clean-up efforts. In fact, John Syms candidly admitted in his deposition that the roadway patching and snow removal did not "relate to the investigation or cleanup of any contamination."

2. *Damage Caused During Asbestos Removal*

[4] Somerset seeks compensation for damage allegedly caused in 1998 by government contractors performing asbestos abatement. Somerset initially wrote the Army Corps of Engineers demanding $184,018 for the damage. At his deposition, however, John Syms could recall spending only $1000 to replace a broken telephone pole.

[5] Costs incurred to repair damage caused by clean-up crews are not usually recoverable under CERCLA. *See Bello v. Barden Corp.*, 180 F.Supp.2d 300, 309 (D.Conn.2002). In *Bello*, the plaintiff intended to spend $2680 to clear debris left behind after a clean-up operation conducted by the EPA and sought a declaratory judgment under CERCLA forcing the government to pay for it. *Id.* at 304. The district court denied the claim because the plaintiff had failed to indicate in its complaint that it would incur the future costs consistent with the national contingency plan. *Id.* at 308. In the alternative, the district court stated that even if the complaint were amended, the plaintiff would not be able to recover the debris-clearing expenses under CERCLA. The district court reasoned that a response is necessary within the meaning of the statute only when it addresses a threat to human health or the environment posed by a hazardous substance. Any such threat had abated when the EPA finished its clean-up, and therefore the plaintiff should have sought compensation through a suit for property damage. *Id.* at 309. We agree with the reasoning of the *Bello* court. Repair of damage caused during clean-up of contamination gives rise to an ordinary tort action, not a cost recovery action under CERCLA.

3. *Activities of Counsel*

*6 [6] Somerset seeks to recover the costs associated with counsel's efforts reviewing historical documents, analyzing boxes of data related to contamination, attempting to identify other PRPs, commenting on work plans, and facilitating site access. The leading case dealing with the recovery of attorney's fees is *Key Tronic Corp. v. United States*, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). The Supreme Court held in *Key Tronic* that private litigants may not recover litigation-related and settlement-related attorney's fees as a necessary cost under CERCLA, but that not "all payments that happen to be made to a lawyer are unrecoverable expenses" and "some lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response." *Id.* at 819-20, 114 S.Ct. 1960. Specifically, it held that the expenses counsel had incurred uncovering the Air Force's disposal of wastes, which in turn prompted the EPA to initiate an enforcement action against the Air Force,

2005 WL 1164011
--- F.3d ----, 2005 WL 1164011 (2nd Cir.(N.Y.)), 35 Envtl. L. Rep. 20,104
(Cite as: 2005 WL 1164011 (2nd Cir.(N.Y.)))

Page 8

were recoverable. The Court reasoned that tracking down other polluters benefits overall clean-up efforts in a way that litigation to apportion costs does not. _Id._ at 820, 114 S.Ct. 1960. We have similarly stated that "expenses incurred solely in preparation for litigation cannot be recovered as response costs unless they significantly benefitted the entire cleanup effort and served a statutory purpose apart from the reallocation of costs." _Gussack Realty Co. v. Xerox Corp._, 224 F.3d 85, 92 (2d Cir.2000) (per curiam) (internal quotation marks omitted).

Somerset has not presented evidence that its efforts uncovered the identity of any PRPs. The government was already aware of Olin's activities, and there is no evidence in the record that Somerset's duplicative identification of Olin significantly benefitted the overall clean-up effort.

The other legal activities, such as negotiating site access, also fail to qualify as necessary response costs. In _Key Tronic_, counsel supervised studies during its negotiations with the EPA that may have affected the scope and form of the clean-up. 511 U.S. at 820, 114 S.Ct. 1960. The Supreme Court held that Key Tronic could not recover these costs because counsel was "primarily protecting Key Tronic's interests as a defendant in the proceedings that established the extent of its liability." _Id._ The same reasoning applies in this case. Even though the site access negotiations were not directly related to litigation, they primarily protected the interests of Somerset as the landowner and do not constitute necessary response costs.

### 4. _Survey of Radioactive Contamination in the Central Drainage Ditch_

[7] Somerset's attorneys hired contractors to perform a limited radiological investigation of the Central Drainage Ditch after learning in 2000 that the government had no intention of reinvestigating the ditch. Somerset was concerned by recent reports of radioactive contamination leaking from the NFSS, which is located a half-mile from its property and connected to it by the Central Drainage Ditch. The study found trace levels of radiation, but the results were inconclusive. Somerset forwarded the results to the Army Corps of Engineers.

*7 Defendants claim the tests were not necessary response costs because they were performed in preparation for litigation. Although John Syms admitted in his deposition that the testing was not done for the purpose of preparing to clean-up the Central Drainage Ditch, he denied that the testing was litigation-related. A genuine issue of material facts therefore exists as to the motivation for the testing.

Summary judgment was nevertheless appropriate for a different reason. The parties do not dispute that Somerset's attorneys paid for the testing. Somerset has not reimbursed them, and there is no evidence in the record that it is obligated to do so. Somerset therefore has not actually incurred any response costs related to the 2000 testing, as far as the record discloses, and cannot maintain a suit under § 107(a) to recover those costs.

### 5. _Medical Monitoring_

[8] Eileen Syms seeks a declaratory judgment requiring defendants to pay for future medical monitoring. Although district courts have split on the issue, the only two courts of appeals to consider the matter have concluded that such private monitoring of an individual's health is not a valid response cost under CERCLA. [FN5] See _Price v. U.S. Navy_, 39 F.3d 1011, 1015-17 (9th Cir.1994); _Daigle v. Shell Oil Co._, 972 F.2d 1527, 1537 (10th Cir.1992). In _Daigle_, the plaintiffs argued that CERCLA covers medical monitoring for two reasons. First, the definition of removal includes "such actions as may be necessary to _monitor,_ assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions _as may be necessary to prevent, minimize, or mitigate damage to the public health_ or welfare or to the environment, which may otherwise result from a release or threat of release." 42 U.S.C. § 9601(23) (emphasis added). Second, the definition of remedial action includes "any monitoring reasonably required to assure that such actions protect the public health and welfare." _Id._ § 9601(24).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Tenth Circuit concluded that the monitoring mentioned by the statute, when read in context, refers to monitoring necessary to prevent contact with hazardous substances, not monitoring to detect future disease based on prior exposure to hazardous substances. *Daigle,* 972 F.2d at 1535. It noted that both houses of Congress had rejected bills providing damages for personal injury and medical expenses. *Id.* at 1535-36. In addition, CERCLA separately provides for public health monitoring through the Agency for Toxic Substances and Disease Registry. *See* 42 U.S.C. § 9604(i).

We agree with the Tenth and Ninth Circuits. Eileen Syms is not entitled under CERCLA to a declaratory judgment requiring defendants to pay for individual medical monitoring related to her prior exposure to hazardous substances.

### 6. *Presence on Site to Admit Contractors*

[9] Somerset claims that various site access agreements with the government "required" John and Eileen Syms "to be present every business day" to let government officials and contractors onto the property. This "requirement" allegedly arose because contractors failed to provide proper notice of their visits as mandated by the site access agreement. Because the Syms could have easily avoided the need to remain constantly on the site by insisting that contractors announce their visits in advance, time spent on the site merely in anticipation that a government official or contractor might show up cannot be considered a necessary response cost.

*8 [10] As for the amount of time spent actually admitting contractors to the site, the extent of which is unclear from the record, we conclude that a genuine issue of material fact precludes summary judgment. Somerset has failed to specify precisely what steps it took to admit contractors, when it took those steps, and what the circumstances were at the time. The record does indicate in general terms, however, that John and Eileen Syms spent some time admitting government officials and contractors to the site in connection with the Remedial Investigation/Feasibility Study commenced in 1998 and the interim asbestos abatement

conducted in the same year. This is sufficient to raise a genuine issue of material fact as to whether the Syms incurred necessary response costs while actually admitting government officials and contractors to the site. [FN6] We therefore remand the case to the district court on this limited point. [FN7]

### C. *Somerset's Eligibility to Sue Under § 107(a)*

We held in *Bedford Affiliates* that a plaintiff who is also a PRP may not bring a cost recovery action under § 107(a) and is instead limited to suing for contribution under § 113. 156 F.3d at 424. Defendants allege that Somerset is a PRP because it contributed to the contamination of its property by leasing a parcel to its neighbor to use as a landfill. Defendants accordingly argue that Somerset cannot sue under § 107(a). Somerset responds that it is not a PRP and that the Supreme Court's ruling in *Cooper Industries* has fatally undermined *Bedford Affiliates.* [FN8]

The district court did not expressly consider whether Somerset was eligible to sue under § 107(a) because, assuming Somerset could sue, it reasoned that the costs incurred were not necessary within the meaning of CERCLA. Because we conclude that summary judgment should not have been granted with respect to certain costs Somerset incurred while admitting government officials and contractors to the site, we must decide whether to address Somerset's eligibility to sue under § 107(a). Although we have the authority to affirm the district court opinion on any basis supported by the record, *ACEquip,* 315 F.3d at 155, we decline to exercise that authority with respect to determining whether Somerset is a PRP or whether the rule announced in *Bedford Affiliates* remains viable after *Cooper Industries. Cooper Industries* was decided after oral argument was held in this case, and the parties have not fully briefed or argued its impact on *Bedford Affiliates.* We therefore believe the best course is simply to vacate the judgment and to allow the district court to address in the first instance the issue of Somerset's eligibility to sue under § 107(a). [FN9]

### II. Federal Tort Claims Act

The FTCA waives the federal government's sovereign

Page 10

2005 WL 1164011
--- F.3d ----, 2005 WL 1164011 (2nd Cir.(N.Y.)), 35 Envtl. L. Rep. 20,104
(Cite as: 2005 WL 1164011 (2nd Cir.(N.Y.)))

immunity "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The statute looks to state substantive law to determine whether the plaintiff has a valid cause of action. The federal government, however, does not stand on the same footing as a private party with respect to the accrual and timeliness of claims. The FTCA's statute of limitations provides that a "tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b).

*9 [11][12] The date on which an FTCA claim accrues is determined as a matter of federal law. See Kossick v. United States, 330 F.2d 933, 935 (2d Cir.1964); Quinton v. United States, 304 F.2d 234, 235 (5th Cir.1962); see also Tyminski v. United States, 481 F.2d 257, 262-63 (3d Cir.1973) (collecting cases). But see Hau v. United States, 575 F.2d 1000, 1002 (1st Cir.1978) (following lex loci rule, but noting uniqueness of this position among circuits). Depending on the circumstances, claims accrue either at the time of injury or when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the facts giving rise to the cause of action. See, e.g., United States v. Kubrick, 444 U.S. 111, 120, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); Kronisch v. United States, 150 F.3d 112, 121 (2d Cir.1998); Barrett v. United States, 689 F.2d 324, 327 (2d Cir.1982). In environmental cases involving latent contamination, courts have generally applied the discovery rule. See, e.g., Plaza Speedway, Inc. v. United States, 311 F.3d 1262, 1268 (10th Cir.2002); Muth v. United States, 1 F.3d 246, 249 (4th Cir.1993).

[13] The statute of limitations has clearly run on the harm caused by radioactive contamination. Somerset was aware of this contamination by 1972 at the latest, but failed to file an administrative claim for over twenty-seven years.

[14] The nonradioactive contamination requires further discussion. The district court concluded that Somerset was sufficiently aware of the existence of contamination on its land that its claim accrued under federal law more than two years before it filed its administrative claim. The district court accordingly considered Somerset's FTCA claims to be time-barred. Somerset argues on appeal that its action was timely because (1) new causes of action keep arising each day under the continuing tort doctrine; (2) its claims based on the presence of lithium and RDX were separate and distinct injuries and timely because the contamination was only revealed in 1999; and (3) the government is estopped from arguing that Somerset should have discovered the contamination earlier because it fraudulently advised Somerset that its property was clean.

## A. Continuing Tort Doctrine

Somerset argues that the district court erred when it refused to apply the continuing tort doctrine to its case. The continuing tort doctrine is based on the idea that certain torts continually give rise to new causes of action, which can be brought notwithstanding the expiration of the limitations period for prior causes of action. For example, the operation of a nuisance on one piece of land might diminish the enjoyment of the neighboring piece of land. Awarding damages for permanent loss of property value suffered by the neighbor would not necessarily be appropriate because the operation of the nuisance might cease at any time. The continuing tort doctrine instead recognizes new causes of action as long as the nuisance continues and thereby allows the plaintiff to return to court periodically to recover the damages suffered since the last period compensated. A disadvantage to the use of this doctrine is that it results in serial litigation, potentially without end, at enormous cost and great inefficiency.

*10 A handful of cases have applied the continuing tort doctrine to claims against the federal government under the FTCA. See, e.g., Hoery v. United States, 324 F.3d 1220, 1223-24 (10th Cir.2003); Arcade Water Dist. v. United States, 940 F.2d 1265, 1269 (9th Cir.1991); Gross v. United States, 676 F.2d 295, 300 (8th Cir.1982); Kennedy v. United States, 643 F.Supp. 1072, 1079 (E.D.N.Y.1986).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The government argues that these cases were incorrectly decided. It contends that allowing a state continuing tort theory to create new causes of action under the FTCA would effectively undermine Congress's interest in creating a nationally uniform limitations period and interfere with the principle that accrual is a matter of federal law. In the alternative, the government argues that a continuing tort theory resets the accrual date for a claim only when there are "continuing wrongful overt acts, not simply continuing injury."

Somerset responds that the government overstates Congress's interest in uniformity because, by incorporating state substantive law, the FTCA already tolerates a great deal of variation from state to state in whether behavior will be considered tortious. Somerset also contends that the continuing tort doctrine, properly understood, is not an accrual rule, but rather a rule of substantive state law authorizing multiple causes of action that sequentially arise as tortious behavior persists.

We need not decide whether a continuing tort claim might be valid under the FTCA, notwithstanding the fact that accrual is governed by federal law, in order to resolve the FTCA claim before us. Even assuming a continuing tort claim could be brought under the FTCA to recover damages for injuries sustained in the two years before the filing of the claim, such a claim would have to be valid under local law, and Somerset may not bring such a suit because New York law no longer recognizes the existence of the continuing tort doctrine in latent exposure cases seeking money damages.

Historically, New York's statute of limitations generally began to run at the time of injury. Over the years, however, a "narrow common-law exception evolved to ameliorate the harshness of this accrual rule with respect to some particular continuous wrongs." *Jensen v. General Elec. Co.,* 82 N.Y.2d 77, 85, 623 N.E.2d 547, 550, 603 N.Y.S.2d 420, 423 (1993). In a seminal case, for example, the New York Court of Appeals allowed a landowner to sue an elevated railroad for nuisance a year after the limitations period expired because the continued operation of the railroad cut off light, air, and access to plaintiff's property.

*Galway v. Metro. Elevated Ry. Co.,* 128 N.Y. 132, 28 N.E. 479 (1891). *See also 509 Sixth Ave. Corp. v. New York City Transit Auth.,* 15 N.Y.2d 48, 51-53, 203 N.E.2d 486, 487-88, 255 N.Y.S.2d 89, 91-92 (1964) (extending *Galway* to subterranean encroachment by railway line not discovered for twenty-one years). New York courts also applied the continuing tort doctrine in some environmental contamination cases. *See Kearney v. Atl. Cement Co.,* 33 A.D.2d 848, 849, 306 N.Y.S.2d 45, 46-47 (3d Dept. 1969) (continuing production of noise, vibrations, and dust at cement plant); *Kulpa v. Stewart's Ice Cream,* 144 A.D.2d 205, 207, 534 N.Y.S.2d 518, 520 (3d Dept. 1988) (continuing contamination from leaking gasoline tank drained and replaced more than three years earlier); *Amax, Inc. v. Sohio Indus. Prods. Co.,* 121 Misc.2d 814, 469 N.Y.S.2d 282, 284-85 (1983) (radioactive contamination from plant which ceased production fourteen years before plaintiff discovered contamination and nineteen years before plaintiff filed suit); *State v. Schenectady Chems., Inc.,* 117 Misc.2d 960, 459 N.Y.S.2d 971, 977 (1983) (applying doctrine to dumping of chemicals that polluted water fifteen to thirty years later), *aff'd as modified,* 103 A.D.2d 33, 479 N.Y.S.2d 1010 (3d Dept. 1984); *see also Rapf v. Suffolk County,* 755 F.2d 282, 290-92 (2d Cir.1985) (applying continuing tort doctrine under New York law). But many courts adhered to the rule that the statute of limitations begins running on the date of injury. *See, e.g., Snyder v. Town Insulation, Inc.,* 81 N.Y.2d 429, 433, 615 N.E.2d 999, 1001, 599 N.Y.S.2d 515, 517 (1993); *Steinhardt v. Johns-Manville Corp.,* 54 N.Y.2d 1008, 1010, 430 N.E.2d 1297, 1299, 446 N.Y.S.2d 244, 246 (1981); *see also Jensen,* 82 N.Y.2d at 85, 623 N.E.2d at 550, 603 N.Y.S.2d at 423 (citing cases).

*11 In 1986, the legislature enacted a discovery rule for environmental contamination cases. *See* N.Y. C.P.L.R. § 214-c. The relevant part of the statute states:
   Notwithstanding the provisions of section 214, the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property must be commenced shall be computed from the date

Case 3:01-cv-00896-MRK    Document 287    Filed 06/15/2005    Page 19 of 24

Page 12

2005 WL 1164011
--- F.3d ----, 2005 WL 1164011 (2nd Cir.(N.Y.)), 35 Envtl. L. Rep. 20,104
(Cite as: 2005 WL 1164011 (2nd Cir.(N.Y.)))

of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.
*Id.* § 214-c(2).

The New York Court of Appeals considered in *Jensen v. General Electric Co.* whether the continuing tort doctrine remains applicable in latent exposure cases following passage of § 214-c. *Jensen* involved contamination at a General Electric (GE) plant operated between 1958 and 1969. Pursuant to a settlement with the State Department of Environmental Conservation, GE obtained plaintiff Perkett's permission to install monitoring wells on her nearby property. The wells revealed a large toxic plume extending beneath Perkett's property. GE sent Perkett a letter in 1984 informing her of the contamination and a copy if its report with her property outlined in black ink. When plaintiff Jensen took title to the property as Perkett's co-tenant in 1986, GE forwarded the same information to him. Plaintiffs eventually filed suit in 1990. *Jensen, 82 N.Y.2d at 82, 623 N.E.2d at 548, 603 N.Y.S.2d at 421.* The Supreme Court granted GE's motion to dismiss the case as time-barred under § 214-c, but the Appellate Division reversed on a continuing trespass and continuing nuisance theory. The New York Court of Appeals subsequently reversed the Appellate Division. It acknowledged that the legislature had enacted § 214-c "to open otherwise closed courthouse doors" kept shut by the time of injury rule, but concluded that the legislature had intended to create a single discovery rule and thereby eliminate the continuing tort doctrine. *Id.,* 82 N.Y.2d at 83-85, 623 N.E.2d at 549-50, 603 N.Y.S.2d at 422-23. The court reasoned that the continuing tort doctrine had grown "out of a jurisprudential climate and landscape where there was no discovery rule," and that § 214-c had eliminated the need for the doctrine by creating a new regime that carefully balances plaintiffs' interest in recovering damages for undiscovered latent injuries against defendants' interest in repose. [FN10] *Id.,* 82 N.Y.2d at 87-88, 623 N.E.2d at 551-52, 603 N.Y.S.2d at 424-25; *see also Town of New Windsor v. Tesa Tuck, Inc.,* 919 F.Supp. 662, 674-75 (S.D.N.Y.1996) (holding that *Jensen* bars application of the continuing tort doctrine to public nuisance suits for money damages).

Because there is no longer any basis in New York law for applying the continuing tort doctrine to Somerset's suit for damages, we need not decide whether the continuing tort doctrine can be used to revive an otherwise untimely suit under the FTCA.

## B. *Application of the Discovery Rule*

*12 [15] Somerset's FTCA claims will be considered untimely if Somerset knew, or should have known, about the nonradioactive contamination on its land by August 25, 1997, two years before it filed its demand and claim letter. The record contains numerous indications that Somerset knew about nonradioactive contamination well before 1997. John Syms attended a public meeting in 1988 at which the government briefed the public about nonradioactive contamination at the LOOW. A document recounted a separate 1988 meeting with a government contractor at which Syms discussed the TNT production plant and pointed out both asbestos and a pit containing PCBs. Another document from 1988 reported on the presence of asbestos, PCBs, and a reservoir containing an "odd smelling liquid." Somerset's complaint states: "In 1988, pressure began to mount from Mr. Syms and others in the community to conduct a more thorough investigation of not only the Radioactive Contamination but *other types* of Contamination at the LOOW." (emphasis added).

John Syms admitted in his deposition that he knew by 1990 that his property had been contaminated. In that year, he wrote a letter with an attachment identifying "chemical waste lands" at Air Force Plant 68. Somerset later received a letter from the Army Corps of Engineers in 1992 informing it in no uncertain terms that the "[r]esults of the [site investigation] confirmed the presence of contamination at the site." Somerset then wrote a letter to President Clinton four months later complaining about the Army Corps' decision to take additional samples when existing surveys already "show[ed] the type of materials that have to be removed." This evidence, viewed in the light most favorable to Somerset, nevertheless indicates that Somerset clearly knew by 1993 at the latest that its land was polluted by nonradioactive contaminants. Somerset has not argued to the contrary.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1164011
--- F.3d ----, 2005 WL 1164011 (2nd Cir.(N.Y.)), 35 Envtl. L. Rep. 20,104
(Cite as: 2005 WL 1164011 (2nd Cir.(N.Y.)))

Page 13

A jury could reasonably find, however, that Somerset's actual knowledge was limited to the presence of asbestos and PCBs. The question under the discovery rule, therefore, is whether Somerset should have discovered the presence of other contaminants through the exercise of reasonable diligence. [FN11]

We agree with the district court that the presence of so many warning signs-- the history of TNT production near the site, the asbestos, the PCBs, the unidentified "odd smelling" liquid, and the presence of a hazardous waste dump next door--should have prompted an investigation. Such an inquiry easily could have uncovered the New York State Assembly's 1981 public report documenting a "vast network of underground waste lines with TNT wastes and residues" and reporting that "neither the areas above or below-ground were ever fully decontaminated by the Army when the property was declared surplus."

## C. *Estoppel Based on Fraud*

[16] Somerset claims the government is estopped from arguing that it should have known about RDX and lithium contamination because the government assured it in 1986 and 1992 that it had cleaned the property. The 1986 letter and 1992 certificate of compliance discuss only the clean-up of radioactive contamination. They do not purport to say anything about nonradioactive contamination, and there is consequently no basis for concluding that the government fraudulently led Somerset to believe its property was free from nonradioactive contamination.

## *CONCLUSION*

*13 We have considered Somerset's remaining arguments and find them to be without merit. For the foregoing reasons, the judgment of the district court is affirmed in part, vacated in part, and remanded for proceedings consistent with this opinion.

FN1. Section 101(23) of CERCLA states:
The terms "remove" or "removal" means [sic] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous

substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under [42 U.S.C. § 9604(b) ], and any emergency assistance which may be provided under the Disaster Relief Act and Emergency Assistance Act.
42 U.S.C. § 9601(23).

FN2. Section 101(24) of CERCLA states:
The terms "remedy" or "remedial action" means [sic] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-00896-MRK    Document 287    Filed 06/15/2005    Page 21 of 24

2005 WL 1164011
--- F.3d ----, 2005 WL 1164011 (2nd Cir.(N.Y.)), 35 Envtl. L. Rep. 20,104
(Cite as: 2005 WL 1164011 (2nd Cir.(N.Y.)))

Page 14

environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.
42 U.S.C. § 9601(24).

FN3. We refer only to the contamination that was discovered in the 1970s and cleaned up in 1986. Somerset has alleged that the NFSS is leaking new radioactive contamination. The survey of the Central Drainage Ditch conducted in 2000, which is the only cost arguably incurred in response to this new contamination, is discussed separately below.

FN4. Specifically, the statute of limitations has run on Somerset's attempt to recover the costs of security fencing installed in the mid-1970s to protect trespassers against exposure to radioactive contamination; security guards deployed from 1972-1980; guard dogs purchased in 1972; the alternative water supply Somerset provided after the Town of Lewistown cut off service in 1974; John Syms's travel to meet with government officials in the late 1970s; a set of as-built drawings purchased in the late 1970s; and the effort John and Eileen Syms expended admitting contractors to the site and maintaining the property during the radiological clean-up. There is no evidence in the record that these costs were incurred in response to anything other than radioactive contamination. Because the statute of limitations has run, we express no opinion on whether any of the costs would have been

recoverable in a timely action.

FN5. The one court of appeals case cited by Somerset in support of its argument involved a claim for medical monitoring brought under state law, not CERCLA. See *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444 (3d Cir.1997).

FN6. Section 104(e) provides the government with a qualified right to enter contaminated property and the right to commence a civil action to compel access if it is denied. See 42 U.S.C. § 9604(e)(3)-(5). Defendants have not argued that this provision evinces an intent to exclude from the definition of response costs time spent admitting government officials to a contaminated site. We therefore do not address that question.

FN7. The scope of the remand is also limited by our holding that the statute of limitations has run on costs incurred in response to radioactive contamination cleaned up in 1986.

FN8. *Bedford Affiliates* expressed concern that § 113(f) would be rendered superfluous if PRPs could choose whether to bring suit under § 107(a) or § 113(f), because PRPs would always choose to proceed under § 107(a), which provides a more generous statute of limitations in certain circumstances, *compare* § 42 U.S.C. § 9613(g)(2), *with id.* § 9613(g)(3), and provides for joint and several liability unless a defendant proves the harm is divisible. *Bedford Affiliates*, 156 F.3d at 424. Somerset, in a letter filed pursuant to Federal Rule of Appellate Procedure 28(j), argues that *Cooper Industries* partially undermines this portion of *Bedford Affiliates'* reasoning by clarifying that a PRP can seek contribution under § 113(f) only after being sued under § 106 or § 107(a). Together, *Cooper Industries* and *Bedford Affiliates* leave a PRP with no mechanism for recovering response costs until proceedings are brought against the PRP. This might discourage PRPs from voluntarily initiating clean-up, contrary to CERCLA's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1164011
--- F.3d ----, 2005 WL 1164011 (2nd Cir.(N.Y.)), 35 Envtl. L. Rep. 20,104
(Cite as: 2005 WL 1164011 (2nd Cir.(N.Y.)))

Page 15

stated purpose of "induc[ing] such persons voluntarily to pursue appropriate environmental response actions with respect to inactive hazardous waste sites." H.R.Rep. No. 96-1016(I), at 17 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6120. This is because if a PRP remediates a facility on its own initiative, it reduces the likelihood that it will be sued under § 106 or § 107(a), and thereby jeopardizes its opportunity to seek contribution under § 113(f) from other PRPs. The combination of *Cooper Industries* and *Bedford Affiliates,* if the latter remains unaltered, would create a perverse incentive for PRPs to wait until they are sued before incurring response costs.

FN9. We similarly express no opinion on defendants' argument, upon which the district court made no ruling, that Somerset is ineligible to recover response costs because it failed to comply with the national contingency plan, as required by § 107(a)(4)(A). *See* 42 U.S.C. 9607(a)(4)(A). We leave it to the district court to rule on this contention in the first instance.

FN10. The New York Court of Appeals determined that § 214-c, which by its terms covers actions "to recover damages," does not alter the availability of injunctive relief in equity under a continuing tort theory. *Jensen,* 82 N.Y.2d at 89-90, 623 N.E.2d at 553, 603 N.Y.S.2d at 426; *see also Bano v. Union Carbide Corp.,* 361 F.3d 696, 713 (2d Cir.2004). This exception does not help Somerset, however, because it has not sought injunctive relief.

FN11. Somerset argues that under New York's "two-injury" rule it may bring separate causes of action for soil contamination and groundwater contamination, and that notice (whether actual or constructive) of one injury does not necessarily provide notice of the other. *See Bimbo v. Chromalloy Am. Corp.,* 226 A.D.2d 812, 815-16, 640 N.Y.S.2d 623,

625-26 (3d Dept. 1996). We need not decide whether the two-injury rule creates distinct causes of action in a suit under the FTCA because the relevant question under the two-injury rule and the federal discovery rule is the same in the context of this case: Given Somerset's knowledge of other nonradioactive contamination, did Somerset know, or through the exercise of reasonable diligence should it have known, about the presence of RDX and lithium in its groundwater?

--- F.3d ----, 2005 WL 1164011 (2nd Cir.(N.Y.)), 35 Envtl. L. Rep. 20,104

### Briefs and Other Related Documents (Back to top)

• 03-6234 (Docket)

    (Nov. 04, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                          Page 1
2005 WL 1367065 (E.D.Cal.)
(Cite as: 2005 WL 1367065 (E.D.Cal.))

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. California.
ADOBE LUMBER, INC., a California corporation,
Plaintiff,
v.
Harold TAECKER, an individual, and Geraldine
Taecker, an individual,
Defendants.
No. CV S02-186 GEB GGH.

May 24, 2005.

*ORDER*

BURRELL, J.

*1 AND RELATED COUNTERCLAIM AND THIRD
PARTY COMPLAINT.

Pending are cross-motions for partial summary
judgment. On March 4, 2005, Defendants and
Counter-claimants Harold and Geraldine Taecker
("Taeckers") filed a partial summary judgment motion
on Plaintiff Adobe Lumber, Inc.'s ("Adobe") 42 U.S.C.
§ 9607 (" § 107") and § 9613 (" § 113") claims, which
are alleged under the Comprehensive Environmental
Response, Compensation and Liability Act of 1980, 42
U.S.C. §§ 9601-9675 ("CERCLA"). [FN1] The
Taeckers argue Adobe cannot assert a claim under §
113 because the recent Supreme Court ruling in *Cooper
Indus., Inc. v. Aviall Servs., Inc.,*      U.S.    , 125
S.Ct. 577, 584 (2004) ("*Aviall*"), forecloses a § 113
claim where the private party has not been subject to a
civil action under CERCLA. Adobe concedes the
correctness of the Taeckers' position. Therefore,
Adobe's § 113 claim is dismissed.

FN1. On March 5, 2005, Third Party
Defendants Wells Fargo Bank, N.A., and F.
Warren Hellman as Trustees of Trust A
created by the Estate of Marco Hellman, and
F. Warren Hellman as Trustee of Trust B
created by the Estate of Marco Hellman,
joined in the Taeckers' motion for partial
summary judgment.

The Taeckers also argue Adobe's pled § 107 claim is
not actionable because of case precedent that precludes
Adobe from pursuing a joint and several theory of
liability. Adobe agrees with the Taeckers; therefore,
Adobe's claim for joint and several liability under § 107
is dismissed.

However, Adobe argues that it is not prevented from
pursuing a recovery action on some form of liability
other than joint and several. On March 18, 2005,
Adobe filed a motion for partial summary judgment in
which it seeks to establish the Taeckers' liability under
§ 107 "for costs incurred by Adobe to respond to the
release of the hazardous substance perchloroethylene ...
from the Taeckers' former dry cleaning facility ... at the
'Woodland [Shopping] Center' ...--a small strip mall in
downtown Woodland, California that Adobe currently
owns." (Pl.'s Mem. Supp. Pl.'s Cross-Mot. Partial
Summ. J. at 1.) The Taeckers counter that this motion
is untenable because it erroneously assumes that Adobe
has pled a § 107 contribution claim. The Taeckers also
argue the motion fails because Adobe has not shown
compliance with the National Contingency Plan.

Adobe rejoins it has sufficiently pled a contribution
claim, arguing:

The Taeckers have known for nearly three years (the
Complaint was filed January 22, 2002) that Adobe
seeks to recover all or a portion of its response costs
from them in this action as permitted under
CERCLA and state law. That one of Adobe's claims
pleads a *higher* standard of liability than the standard
of liability the Taeckers actually face in this action
cannot reasonably be claimed to have caused
prejudice.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1367065 (E.D.Cal.)
(Cite as: 2005 WL 1367065 (E.D.Cal.))

Page 2

(Pl.'s Reply Br. Supp. Cross-Mot. Partial Summ. J. at 16.)

Adobe's Complaint sufficiently provided notice to the Taeckers that Adobe seeks contribution under CERCLA. But the parties dispute whether Adobe's contribution claim is now actionable in light of the Supreme Court's holding in *Aviall*. *Aviall* does not foreclose Adobe's contribution claim since the Supreme Court did not rule on whether contribution is available under § 107. *Aviall*, 125 S.Ct. at 586 n. 6 (stating "we do not address whether a § 107 cost recovery action by Aviall" may be actionable under "some form of liability other than joint and several"). Thus, Ninth Circuit precedent governs this issue. The Ninth Circuit observed in *Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1301 (9th Cir.1997), that "the essence of a claim for contribution ... is imbedded in the text of § 107." *Pinal Creek* was explained in *Western Properties Service Corp. v. Shell Oil Co.*, 358 F.3d 678, 685 (9th Cir.2004), as follows: "*Pinal Creek* held that the enactment of § 113 in 1986 did not replace the implicit right to contribution many courts recognized in § 107(a); rather, § 113 determines the 'contours' of § 107, so that a claim for contribution requires the 'joint operation' of both sections." Thus, in the wake of *Aviall*, Adobe's § 107 claim is construed as it was before the congressional enactment of § 113. *See Pinal Creek*, 118 F.3d at 1301 (stating that "[t]he legislative history behind § 113(f) also supports the conclusion that, in enacting that provision, Congress was only confirming and clarifying an existing claim for contribution under § 107."). Therefore, the Taeckers' motion for partial summary judgment on Adobe's § 107 contribution claim is denied.

*2 Adobe's motion which seeks to establish the Taeckers' liability is denied because it did not address all the elements of a § 107 contribution claim. *See Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 870 (9th Cir.2001).

IT IS SO ORDERED.

2005 WL 1367065 (E.D.Cal.)

**Motions, Pleadings and Filings (Back to top)**

• 2:02CV00186 (Docket)

(Jan. 22, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.